CITY OF NEW YORK, Plaintiff, *v.* INTERBOROUGH RAPID TRANSIT COMPANY, Defendant.

Supreme Court, New York County, February 28, 1930.

*Arthur J. W. Hilly, Corporation Counsel* [*E. J. Kohler, Joseph A. Devery,* and *M. Maldwin Fertig* of counsel], for the city.

*Samuel W. Untermyer* and *Irwin Untermyer,* for the Transit Commission.

*James L. Quackenbush* and *W. L. Ransom* [*J. H. Goetz, A. S. Hubbard* and *John Fletcher Caskey* of counsel], for the defendant.

INGRAHAM, J. The present action has been brought by the Transit Commission of the State of New York, for and on behalf

of the city of New York, to compel a specific performance by the defendant of the so-called " five-cent fare clauses " in two certain contracts to which the defendant is a party, which contracts are known, or at least have come to be known in the course of this litigation, as contract No. 3 and the elevated extension certificate. The plaintiff also seeks to enjoin the defendant from carrying out its avowed intention of increasing the existing rate of fare on its subway and elevated lines from five to seven cents. This suit constitutes, therefore, another chapter in the history of rapid transit within this metropolis, where the problem of transporting millions of inhabitants is rendered exceedingly more difficult by reason of the countless thousands of transients constantly within the gates of our city. This history, in so far as it is relevant to the case now under consideration, may be, on account of the limitations of a decent economy of space, only briefly outlined.

It dates from the passage of the Rapid Transit Act of 1891 (Laws of 1891, chap. 4) by the Legislature of this State in an effort to aid in the provision of " Rapid transit railways in cities of over one million inhabitants." That statute contemplated private construction and operation of rapid transit lines under franchises to be granted by the Board of Rapid Transit Commissioners, therein appointed (Laws of 1891, chap. 4). Section 7 of the act provided that the terms of sale of such franchises " must," among other things, " specify the * * * maximum rates of fares and freight which such corporation may charge and collect for the carriage of persons and property." The act also contained authority (section 32) for the Commissioners to permit the extension of existing or thereafter constructed lines and for the issuing of an extension " certificate " therefor upon specified conditions and upon " such other terms, conditions and requirements as to the said board may appear just and proper." In 1894 this act was amended to provide for a referendum at the next general election upon the question whether rapid transit facilities in the city of New York should be constructed by the city (Laws of 1894, chap. 752, §§ 12, 13). The people approved the proposal by an overwhelming vote in its favor, and under sanction of this act were constructed the lines owned by the city and now operated by the defendant as its subway division. What are known as contracts 1 and 2, covering these lines, were entered into on February 21, 1900, and July 21, 1902, and subsequently assigned to the defendant. Both of these contracts contain the following provision: " The contractor shall during the term of the lease be entitled to charge for a single fare upon the railroad the sum of five cents, but not more." The defendant apparently has never denied that contracts 1 and 2 established an inflexible five-cent fare.

In 1903 defendant leased all the elevated lines of the Manhattan Railway Company for a term of 999 years, agreeing to pay as rental therefor seven per cent on the stock of the Manhattan Company. In 1906 the Rapid Transit Act was amended requiring the approval of the city in the execution of any contract or extension certificate (Laws of 1906, chap. 472). In 1907 there was passed the Public Service Commissions Law (Laws of 1907, chap. 429),* the relation of which to the questions here involved will later be discussed. In 1909 further amendments were made to the Rapid Transit Act (Laws of 1909, chap. 498) to further extend the powers of the commission and the city. Contracts 1 and 2 failed to provide adequate facilities to properly care for the city's ever-growing need for more rapid transit facilities, and there were proposed two plans for the construction and operation of new lines; one of these, under agreement with the defendant, ripened into contract No. 3 and the elevated extension certificate of 1913, with which we are here concerned. The most casual reading of the record of negotiations preliminary to these agreements yields no other conclusion but that the five-cent fare clause furnished the chief bone of contention between the city and the commission on the one hand, and the defendant on the other. The Supreme Court of the United States, in the case of *Gilchrist* v. *Interborough Rapid Transit Co.* (279 U. S. 159) refers to the events transpiring during this period, as follows: " In 1912, as specially requested by the Board of Estimate and with full knowledge of the circumstances, the Legislature enacted the Wagner Bill which amended the Rapid Transit Act so as definitely to authorize the Contracts and Certificates, finally signed March 19, 1913, and above described, whose provisions, after long negotiations, had been tentatively agreed upon prior to the amendment."

The amendment referred to was contained in a bill introduced in the New York State Legislature by Senator Robert F. Wagner and which had been drafted by the Public Service Commission. Pending its passage the board of estimate and apportionment passed a resolution on March 21, 1912, wherein we find the following significant language:

" WHEREAS, The Public Service Commission for the First District and the Board of Estimate and Apportionment of the City of New York have under consideration plans for the construction and operation of a system of subway and rapid transit lines that will extend rapid transit facilities to every part of the city and secure to the people an extension of service that will increase threefold the area throughout which passengers may be carried for a *single five cent fare;* and * * *

" WHEREAS, There is now pending before the Legislature an act

* Changed to Public Service Commission Law by Laws of 1921, chap. 134.— ]REP.

amendatory of the rapid transit act \* \* \* and designed to permit the public authorities to enter into contracts for the construction, equipment and operation of rapid transit lines. \* \* \*

" *Resolved,* That the Board of Estimate and Apportionment of the City of New York earnestly urges upon the Legislature the importance of the prompt passage of Senate Bill No. 1277 amending the rapid transit act and introduced by Senator Wagner on March 18th. \* \* \* "

The bill in question was enacted on April 9, 1912, as chapter 226 of the Laws of 1912. On March 19, 1913, contract No. 3 and the elevated extension certificate were executed. In both agreements the continuance of a maximum fare of five cents was agreed to by the defendant.

The five-cent fare clause in contract 3 is set forth as follows (Article XLII): " The lessee shall during the term of the contract be entitled to charge for a single fare upon the railroad and existing railroads *the sum of five cents but not more.*" In return for the promise by the defendant of the five-cent fare, there was conferred upon it the benefit of certain preferential payments out of revenue in order that it might be compensated for a possible diminution of earnings from the operation of an extended system at a single fare. In the elevated extension certificate (Article VI) it is provided: " The Interborough Company shall be entitled to charge for a single fare for each passenger for one continuous trip \* \* \* *the sum of five cents but not more.*" In the certificate the division of earnings between the defendant and the city is such as to clearly demonstrate that the parties to the agreement understood that the preferential payments therein guaranteed to the company were promised to it as a protection for a possible falling off in earnings as a result of the operation of an extended system at a single fare of five cents. In both documents the bargain stands out as if the details of the negotiations were there set forth. The preferential payments and guaranteed revenue were the price the city paid for the defendant's promise that the five-cent fare would endure so long as the contracts would live.

Other provisions of contract No. 3 are important, as follows: " Article I. \* \* \* The City and the Lessee further agree upon the modification of Contract No. 1 and Contract No. 2 in the respects herein set forth, but nothing in this contract shall be construed as a modification or waiver of any of the rights or obligations of the respective parties \* \* \* except in the respect and *to* the extent herein specifically set forth."

In this connection it must be noted that the five-cent fare provisions contained in contracts Nos. 1 and 2 are not specified among

the provisions modified by contract No. 3. " Article III. This contract is made pursuant to the Rapid Transit Act which is to be deemed a part hereof as if incorporated herein."

The elevated extension certificate contained provisions defining the word " city " as used therein to mean the city of New York or any other corporation or division of government to which the ownership, rights, powers and privileges of the city of New York shall hereafter come, belong or appertain, " under the Rapid Transit Act," and similarly the word " Commission " to mean the Public Service Commission for the First District " in so far as it acts herein under the Rapid Transit Act " or any official to whom the powers now " conferred upon the said Commission by the Rapid Transit Act " may hereafter be transferred.

In order that the picture may be complete, reference must be made to the efforts of the defendant in the past decade to obtain an increase of fare on its lines covered by the contracts in question. In 1920 it applied to the Public Service Commission for a higher fare on its subway lines. The application was denied, whereupon defendant instituted certiorari proceedings to review the action of the Commission which proceeding it discontinued two years later. In 1922 defendant applied anew for the increase on both subway and elevated lines, and when the Transit Commission refused to take jurisdiction of the petition, no further steps were taken by the defendant. On February 14, 1928, the defendant instituted an action in the United States District Court for the Southern District of New York, and sought therein an injunction against an attempt to interfere with the establishment of a seven-cent fare on the subway division and Manhattan division. An interlocutory injunction was granted by the District Court (26 F. [2d] 912), but on appeal to the Supreme Court of the United States the determination of the District Court was reversed. (Gilchrist v. Interborough Rapid Transit Co., 279 U. S. 159.) The present action was also commenced on February 14, 1928, the same day as the action in the Federal District Court, following the rejection by the Transit Commission of the seven-cent fare schedules filed by the defendant under section 29 of the Public Service Commission Law (as amd. by Laws of 1921, chap. 134). By an order of this court, signed by Mr. Justice FRANKENTHALER,* the issue of confiscation has been severed from the other issues presented in the action, leaving as the basic question to be decided here whether the provisions of contract No. 3 and the elevated extension certificate, guaranteeing a five-cent fare during the endurance of the agreements, are subject to the regulatory provisions of the Public Service Commission Law.

It is settled beyond successful dispute that a State may authorize

* See 134 Misc. 827.

a municipal corporation to establish by an inviolable contract the rates to be charged by a public service corporation for a definite term and thereby suspend during the life of such contract the governmental power of fixing and regulating rates. (*Home Telephone & Telegraph Co.* v. *Los Angeles*, 211 U. S. 265; *St. Cloud Public Service Co.* v. *St. Cloud*, 265 id. 352; *Railroad Commission of California* v. *Los Angeles Railway Corp.*, 280 id. 145.) And in such cases the courts may not relieve the utility from its obligation to serve at the agreed rates, however inadequate. The enforcement of such rates is controlled by the obligation resulting from the contract. (*St. Cloud Public Service Co.* v. *St. Cloud, supra; Railroad Commission of California* v. *Los Angeles Railway Corp., supra.*)

As has been pointed out, the agreements in question were entered into pursuant to the authority of the 1912 amendments to the Rapid Transit Act (Laws of 1912, chap. 226). This fact was recognized by the Supreme Court of the United States, when it said in *Gilchrist* v. *Interborough Rapid Transit Co. (supra)*: "In 1912, as specially requested by the Board of Estimate and with full knowledge of the circumstances, the Legislature enacted the Wagner Bill which amended the Rapid Transit Act so as definitely to authorize the Contracts and Certificates, finally signed March 19, 1913, and above described, whose provisions, after long negotiations, had been tentatively agreed upon prior to the amendment."

While apparently under prior legislation the Commission was empowered to enter into such contracts, any possible doubt was entirely dissipated by the enactment of the Wagner Bill. (*Admiral Realty Co.* v. *City of New York*, 206 N. Y. 110.) The Public Service Commission Law, as was indicated by the United States Supreme Court in the *Gilchrist* case, "is a general law relative to regulation and control of public utilities throughout the State. It contains no words purporting to amend or modify the Rapid Transit Act except:— Those abolishing the Board of Rapid Transit Railroad Commissioners and directing that, in addition to other duties ' * * * the Commission * * * shall have and exercise all the powers heretofore conferred upon the Board of Rapid Transit Railroad Commissioners.' "

Section 27, subdivision 2, of the Rapid Transit Act, as amended in 1912 (Laws of 1912, chap. 226, § 8), empowered the Commission to enter into a contract with the defendant and provided that such contract should contain "such terms and conditions as to the rates of fare to be charged and the character of services to be furnished and otherwise as said commission shall deem to be best suited to the public interests." Section 24, subdivision 1, of the act, as similarly amended (Laws of 1912, chap. 226, § 3) with reference to the

elevated certificate, authorized the Commission to " fix and determine the locations and plans of construction of the railroads upon such route or routes and of such tracks and facilities, the times within which they shall be respectively constructed, the compensation to be made therefor to the city by said person, firm or corporation, and such other terms, conditions and requirements as to the said boards may appear just and proper." This section further provided that such a certificate, when delivered and accepted, should " be deemed to constitute a contract between the said city and said person, firm or corporation according to the terms of the said certificate; and such contract shall be enforceable by the commission acting in the name of and in behalf of the said city or by the said person, firm or corporation according to the terms thereof " (§ 24, subd. 4 [Laws of 1891, chap. 4], as amd. by Laws of 1909, chap. 498, § 7). A reading of other provisions persuasively carries us to the conclusion that the intent of the Legislature in enacting the amendments of 1912 was to authorize the execution of contracts with respect to the rate of fare to be charged on both the subway and elevated lines (§ 27, subd. 8; § 29, subd. 3; § 38). The defendant strenuously contends that, since the Transit Act as amended, with particular reference to section 24, contains no specific reference to fares, no authority was conferred upon the Commission to contract concerning the rate of fare on the elevated lines. Section 24, when read in conjunction with the entire act, contains language sufficiently broad to include fares, and under its provisions the Commission is empowered to contract with reference to rates of fare as well as to prescribe other requirements in the agreements. The conclusion becomes unescapable, therefore, that the Legislature, having expressly authorized the fare stipulations entered into between the Commission and the defendant in contract 3 and the certificate, could not have intended at the same time to subject the contract to subsequent regulation. To hold that such an intention existed would be in effect to brand the action of the Legislature as purposeless.

This phase of the question has received the consideration of the United States Supreme Court in *Gilchrist* v. *Interborough Rapid Transit Co.* (*supra*), wherein is found the following significant language: " The power of the city to enter into contracts Nos. 1 and 2 was affirmed in *Sun* [*Printing &*] *Publishing Ass'n* v. *The Mayor* [*City of New York*] *supra* [152 N. Y. 257]; likewise the validity of contract No. 3 was declared in *Admiral Realty Co.* v. *City of New York, supra*. These cases point out that the object of those contracts was to secure the operation of railways properly declared by statute to be part of the public streets and highways

and the absolute property of the city." And further in the same opinion: "Both the bill of complaint and the argument of counsel here proceed upon the theory that under the law of New York, as clearly interpreted by definite rulings of her courts, the contracts for operating the transit lines impose no inflexible rate of fare. With this postulate we cannot agree." The Supreme Court then comments on the decision of the Court of Appeals of this State in the case of *People ex rel. City of New York* v. *Nixon* (229 N. Y. 356), which is cited with great reliance by the defendant in the instant action. No better refutation could be found for the argument advanced by the Interborough here that the *Nixon* case is authority for its contention than to quote the following language of the supreme judicial tribunal of the land (*Gilchrist* v. *Interborough Rapid Transit Co.*, *supra*): "The circumstances there were radically different from those now presented. The effect of a contract with the City, expressly authorized by amendment to the Rapid Transit Act adopted subsequent to enactment of the Public Service Commission Law, was not involved. The court carefully limited its opinion. And it said: 'The conditions of other franchises may supply elements of distinction which cannot be foreseen. Contracts made after the passage of the statute (Consol. Laws, chap. 48 [Public Service Commission Law]) may conceivably be so related to earlier contracts either by words of reference or otherwise as to be subject to the same restrictions. We express no opinion upon these and like questions. They are mentioned only to exclude them from the scope of our decision. In deciding this case, we put our ruling upon the single ground that the franchise contract of October, 1912, was subject to the statute and by the statute may now be changed.'"

The *Nixon* case, therefore, contains no authority for the proposition advanced by defendant here to sustain its attempt to annul a condition accepted by it as a part of its agreement and to impair the obligation which it assumed in return for the benefits it has received under the contracts which it now seeks to abrogate. Neither are *People ex rel. Village of South Glens Falls* v. *Public Service Commission* (225 N. Y. 216) and *Town of North Hempstead* v. *Public Service Corporation of Long Island* (231 id. 447) productive of authority to support defendant's contention. In those cases there was lacking the very authority to contract, which the parties here received by virtue of the Rapid Transit Act and amendments thereto.

I cannot agree with defendant's claim that the fare provisions of contracts 1 and 2 were abrogated and superseded by the provisions of contract 3. As has been pointed out, the recitals in contract

3 expressly state that " nothing in this contract shall be construed as a modification or waiver of any of the rights or obligations of the respective parties under Contract Number 1 and Contract Number 2, excepting in the respect and to the extent herein specifically set forth." The fare provisions of the earlier agreements are not among the exceptions noted in the later contract. Rather, then, the agreements with which we are here concerned " made after the passage " of the Public Service Commission Law are " so related to earlier contracts * * * as to be subject to the same restrictions." It has been settled that the Public Service Commission Law is not sufficiently clear and definite to be held to apply to contracts executed prior to its enactment. (*Matter of Quinby* v. *Public Service Commission*, 223 N. Y. 244.) As was said by the Court of Appeals in the case last cited: " The delegation of legislative power to commissions and other administrative officers and boards need not be assumed if the general words from which such delegation may be inferred are not reasonably so construed. In the absence of clear and definite language conferring, without ambiguity, jurisdiction upon the public service commission to increase rates of fare agreed upon by the street railroad and the local authorities, we should not unnecessarily hold that the Legislature has intended to delegate any of its powers in the matter, whatever its powers may be. The Public Service Commissions Law * * * and the Railroad Law * * * deal with maximum rates of fare established by statute, but make no reference in terms to rates established by agreement with local authorities. * * * As it has often been held in connections other than that of legislative power over them that such agreements are valid, it may well be inferred that the Legislature excluded them from consideration by failure to mention them and that it has made no attempt to turn them over to the public service commission for revision." (*Matter of Quinby* v. *Public Service Commission, supra,* 223 N. Y. 244, 263, 264.) Had the Legislature intended to subject the rates agreed to by the parties here to regulation under the Public Service Commission Law, it might easily have amended the Rapid Transit Act in that regard as it did in the case of the Railroad Law, which it amended to subject statutory rates to the jurisdiction of the Commission. That it failed to do so in the case of the Rapid Transit Act indicates that the Legislature intended that the contractual rates of fare authorized by that act should be immune from regulation by the Commission.

That the Legislature intended the parties to establish a contractual rate which would be free from subsequent alteration or regulation, except by the consent of the contracting parties, and that such inten-

tion on the part of the legislative body was understood and accepted by the defendant, as well as by the city, is clearly indicated by the amendments to the Public Service Commission Law in 1921, 1922 and 1923 (Laws of 1921, chap. 134; Laws of 1922, chap. 153; Laws of 1923, chap. 891). In 1921 the Legislature (Laws of 1921, chap. 134, § 29, subd. 1) so amended section 49 of the act as to include any " contract, grant, franchise condition, consent or other agreement." Defendant claims that the purpose of this amendment was to subject the very contracts which we have been discussing to the operation of the Public Service Commission Law. In 1923 (Laws of 1923, chap. 891, § 1) the statute was again amended, with the result that section 49 was restored virtually to the condition in which it was prior to the passage of the 1921 amendment. Clearly this indicates that prior to 1921 the Legislature did not consider these agreements subject to the regulatory provisions of the Public Service Commission Law, and by restoring the law as it was prior to 1921 any power the Commission then received was removed. That this interpretation of the statutes was not, as late as 1925, disputed by the defendant, is shown by its petition in that year addressed to the Legislature asking for an increased fare upon the theory that such relief could be obtained from the Legislature alone.

Defendant fails to point out a single instance where the Public Service Commission attempted to exercise regulatory jurisdiction over the rate of fare charged upon defendant's lines. That such regulation may have existed in other particulars fails to justify the conclusion that the contracts in question were to be subject to the regulatory powers of the Commission. Contracts between municipalities and transit companies are subject to the same rules, before the law, as agreements between individuals. The importance of the subject-matter or the magnitude of the contracting parties is powerless to affect the rules of law regarding the enforcement of a binding agreement. The contracts here, and the rate of fare clauses therein, were specifically authorized by the Legislature which delegated to the parties the power to contract concerning fares. That the contract may subsequently have proved unprofitable for one party is not sufficient ground to relieve that party from its duty of performance.

To pursue defendant's argument to its logical conclusion would be tantamount to branding the 1912 amendments to the Rapid Transit Act as a meaningless gesture. To do so would be to hold that although the Legislature authorized the contracts in question, they are subject to regulation and alteration just as if no specific sanction conferred authority for their execution. For what purpose then was the Wagner Bill enacted? Not to ascribe to it its apparent

and legal effect is to make a mockery of the solemn, deliberate action of the legislative branch of our government. The fare clauses appearing in the contracts here were specifically authorized and the obligation of both parties remains. The defendant cannot repudiate the portion which may have become onerous. The city is entitled to a specific performance on the part of the defendant of its contractual duty, thereby assuring to those traveling upon the lines covered by these agreements the uninterrupted continuance of the five-cent fare. The plaintiff is the proper person to institute the present action (Civ. Prac. Act, § 210; Pub. Serv. Comm. Law, § 108, added by Laws of 1921, chap. 134; Rapid Transit Act [Laws of 1891, chap. 4], § 9, subds. 1 and 2, as amd. by Laws of 1909, chap. 498, § 4); and the threatened violation of its contracts by the defendant is sufficient ground for an injunction. (*Vicksburg Water Works Co.* v. *Vicksburg*, 185 U. S. 65.)

Plaintiff is entitled to the relief demanded. Present, on notice, proposed findings of fact and conclusions of law, together with final judgment.