THE CITY OF NEW YORK, Acting by the Transit Commission, Metropolitan Division, Department of Public Service of the State of New York, Respondent, *v.* INTERBOROUGH RAPID TRANSIT COMPANY, Appellant.*

In the Matter of the Application of INTERBOROUGH RAPID TRANSIT COMPANY, Petitioner, for a Certiorari Order against WILLIAM G. FULLEN and Others, Constituting the Transit Commission, Head of the Metropolitan Division of the Department of Public Service of the State of New York, and Another, Respondents, and THE CITY OF NEW YORK, Intervenor.

First Department, April 10, 1931.

* Affg. 136 Misc. 569.

*William D. Guthrie* and *William L. Ransom* of counsel [*Jacob H. Goetz* and *Louis S. Carpenter* with them on the brief; *James L. Quackenbush*, attorney], for the appellant and petitioner, Interborough Rapid Transit Company.

*Samuel Untermyer* of counsel [*Charles Dickerman Williams* with him on the brief; *George H. Stover*, general counsel], for the respondents.

*Arthur J. W. Hilly, Corporation Counsel* [*Edgar J. Kohler* and *Joseph A. Devery* with him on the brief], as *amicus curiæ* on the appeal, and of counsel for the City of New York, defendant-intervenor in the certiorari proceeding.

McAvoy, J.   The first of the causes above entitled is an action by the city of New York, acting through the Transit Commission.

It was commenced on February 14, 1928. In the declaration of its complaint it was asserted that the Interborough Company was operating the subway and elevated railway lines in the city of New York and that the subway is owned by the city and operated under a contract known as contract No. 3, and that the elevated lines are operated under a so-denominated elevated extension certificate issued by the city of New York to the Interborough Company, pursuant to the Rapid Transit Act and accepted by that company. Both the agreement and the certificate provided that the Interborough Company would charge a fare of " five cents, but no more " for a continuous ride in one direction over the routes described.

The Interborough Company, by filing tariff sheets setting forth a proposed fare of seven cents as the fare thereafter to be exacted on its lines, instead of five cents as provided in the contract and certificate, sought to nullify the provisions calling for a fare of not more than five cents. This suit on such declarations seeks an injunction against the charge of more than five cents, and a decree requiring specific performance of the contract as made.

The answer in the first suit admits the execution of the contracts, but alleges that the rate of fare may be changed under the provisions of the Public Service Commission Law, and affirmative defenses are set forth which purport to show that the five-cent fare is confiscatory.

If, however, a valid inflexible fare is imposed by the contracts existing between the parties, the matter of alleged inadequacy of fare to make a reasonable return is not material to this discussion.

A defense which alleged that by virtue of various events, such as the building of new subways, the city was estopped from enforcing the five-cent fare, was said to have been formally withdrawn at the trial. At least we have had no argument or briefing to sustain it.

The proceeding entitled in the second heading is a certiorari proceeding brought to review the acts and determination of the Transit Commission on the complaint of the Interborough Rapid Transit Company under section 49 of the Public Service Commission Law (now known as the Public Service Law) for a hearing and determination as to the just and reasonable rate of fare to be charged on the elevated railroad divisions operated by the petitioner.

In the latter proceeding the Commission dismissed the complaint and petition and gave the right to revive it if the restraining orders now in force are finally dissolved, or if the jurisdiction of the Commission is otherwise established or the said litigation for an injunc-

tion is terminated. The Interborough contends that the Transit Commission has jurisdiction to regulate the rates on the elevated lines. The complaint specifically asks that the Commission determine the ten-cent fare as a reasonable rate on the elevated lines, on the ground of inadequate revenues under the rate prescribed in the certificate.

The suit by the Transit Commission on behalf of the city was brought to prevent the Interborough Company from putting certain schedules into effect, because the Interborough Company, under the assumed authority of section 29 of the Public Service Commission Law (as amd. by Laws of 1921, chap. 134), filed on February 1, 1928, such schedules purporting to provide for a fare of seven cents upon its subway and elevated lines. The question as to whether or not the Transit Commission has jurisdiction to raise the fare under subdivision 1 of section 49 of the law (as amd. by Laws of 1923, chap. 891) does not really arise in this action because the Interborough Company proceeded under section 29, which procedure has been determined to be unlawful under *Matter of Dry Dock, E. B. & B. R. R. Co.* (254 N. Y. 305). There is no doubt that the city was entitled to restrain the Interborough Company from charging seven cents on the basis of schedules filed pursuant to section 29, and the judgment could be sustained on that ground alone on the authority of the *Dry Dock R. R. Co.* case.

However, the judgment of the trial court granted a permanent decree of specific performance of the fare provisions of the contracts, and the city, through the Transit Commission, has assumed the labor of showing that the Commission would lack jurisdiction to interfere with the rate of fare even if the Interborough had proceeded under section 49.

At the trial it was said that the city, through the Transit Commission, did not rely on the improper procedure of the Interborough Company, but challenged the jurisdiction of the Transit Commission over any rates fixed by contracts through any provision giving it jurisdiction to revise rates by the Public Service Commission Law. The parties may so conduct the trial of issues as to be bound by the results.

It is contended by the Transit Commission, in the city's suit, that there was no occasion for a separate proceeding by certiorari with respect to the elevated lines, because the findings and the judgment in this case deal with the elevated lines as fully as they do with the subway lines. We conclude that this was the result of the trial and that the rights and powers and privileges of the elevated lines were affected by the judgment now here.

It is also asserted that bringing the certiorari proceeding, while this suit was pending, and after denial of petition under section 29 of the Public Service Commission Law, was improper because of the pendency of this suit and various restraining orders which prevented the Commission at the time from exercising any jurisdiction with respect to fares on the elevated lines and the Commission was then without power to consider such questions with respect to such fare on the elevated lines. With this contention we are in accord.

While the United States Supreme Court decision in the so-called *Gilchrist Case* (*Gilchrist* v. *Interborough Co.*, 279 U. S. 159) is not conclusive on the question of the right of the defendant to petition for an increase of the rate of fare, it nevertheless said that the Interborough Company in claiming that the contracts do not impose an unalterable rate of fare, does not seek to bring itself within any settled rule of law, but is attempting to create a new doctrine in order to find a way to meet the exigencies of its financial situation, and that court pointed out that the Transit Commission had long held the view that it lacked the power to change the five-cent rate established by contract, and it intended to test this point of law by an immediate, orderly appeal to the courts of the State, and it was said that an injunction should not be issued to thwart such a purpose. That ruling was the direct conclusion of the court and other animadversions may be considered obiter however persuasive in logic.

The United States Supreme Court also said that the bill of complaint in that action and the argument of counsel proceeded on the theory that under the law of the State of New York, as outlined by its court, the contracts under which the transit lines are operated impose no inflexible rate of fare. They then said: " With this postulate we cannot agree," and cited *People ex rel. City of New York* v. *Nixon* (229 N. Y. 356), which the Interborough Company relied upon and stated that the circumstances there were " radically different " from those presented in the Federal case. They said that the effect of a contract with the city, expressly authorized by the Rapid Transit Act (as amd. by Wagner Law, Laws of 1912, chap. 226), adopted subsequent to enactment of the Public Service Commission Law, " was not involved."

The first statute concerning the construction and operation of railroads under the Rapid Transit Act shows an intent on the part of the Legislature to give the city authority to make contracts which would fix the maximum rates of fare and freight charges which such corporation might charge and collect for the carriage of persons and property.

This original act enacted in 1891 granted authority to the then Board of Rapid Transit Railroad Commissioners to permit the extension of then existing or thereafter constructed rapid transit facilities and the issuing of what was called an " Extension Certificate " therefor. These certificates were to be granted on specified conditions, and upon such other terms, conditions and requirements as to the Board might appear just. (See Laws of 1891, chap. 4, §§ 7, 32.)

In 1894, private capital having failed to come in and construct rapid transit lines, the same Rapid Transit Act was amended requiring submission to the electorate at the next general election as to whether rapid transit facilities in New York city should be constructed by the city at its own expense (Laws of 1894, chap. 752, §§ 12, 13), and that if it be determined by vote of the People to construct by and at the city's expense, then, and in that event, the road or roads so constructed shall be and remain the absolute property of the city, and deemed to be part of the public streets and highways of the city, to be used and enjoyed by the public upon the payment of such fares and tolls and subject to such reasonable rules and regulations as may be imposed and provided for by the Board of Rapid Transit Railroad Commissioners in said city. (See Rapid Transit Act, §§ 34-63, as added by Laws of 1894, chap. 752.)

Consequently after the Public Service Commission was substituted for the Board of Rapid Transit Railroad Commissioners as the contractual body to execute the contracts and agree upon the rate of fare, section 63 of the Rapid Transit Act was amended by chapter 498 of the Laws of 1909 by adding at the conclusion thereof " or by the Public Service Commission." The conforming act of 1909 also amended and renumbered several sections of the Rapid Transit Act. However such powers and duties were actually transferred in 1907. (See Laws of 1907, chap. 429, §§ 83-89.)

The People voted approval of this proposal at the election and under the sanction of the Rapid Transit Act the city has constructed and now owns the lines operated by the defendant as the subway division.

The statute also provided that should the People approve the proposal, the Board should make a contract for the construction of the road to be paid for by the city treasury and it was provided that the contract should contain a provision that the individual, firm or corporation constructing the road was to equip, maintain and operate the road for a term of years to be specified in the contract not less than thirty-five nor more than fifty years, and in that statute it was provided that the contract was to be

made upon such terms and conditions as to the rates of fare to be charged and the character of the service to be rendered as the Board should deem best suited to the public interests and subject to such public supervision and to such conditions, regulations and requirements as may be determined upon by the Board.

In 1907, after the Public Service Commissions Law had been enacted, the word " Commission " was substituted for the word " Board."

By the amendments of 1894, section 7 of the Rapid Transit Act, which provided for the granting of a franchise for the private construction and operation of rapid transit lines, was amended by eliminating the provision that the terms of sale must specify the maximum rates of fare, and provided that the rates of fare and freight which the corporation may charge were to be set forth in the terms of sale, but it added that the rate of fare for any passenger on the railway from any point on the same northward or southward within the city shall not exceed five cents under any provision of the act, but this section had no relation to rapid transit lines to be constructed at municipal expense, which were covered by section 34 of the Rapid Transit Act, as added by the act of 1894, and which contained an unlimited grant of power to contract concerning the rate of fare.

At that time, although municipally constructed lines leased for private operations were not restricted in their power to contract with respect to rates of fare, rapid transit lines that might be privately constructed were governed by the terms of the act that the franchise contract to operate should provide that the rate of fare shall not exceed five cents.

There were no changes in the Rapid Transit Act except of subordinate matter, until contracts Nos. 1 and 2 were executed. These were made by the Board of Rapid Transit Railroad Commissioners. Contract No. 1 in February, 1900, was made with John B. McDonald, and provided for the construction of a subway from South Ferry to Forty-second street and Madison avenue, thence to Times Square and then to Van Cortlandt Park, with a branch from Ninety-sixth street to West Farms. This contract provided for the operation by John B. McDonald for a period of fifty years, with a privilege of renewal for twenty-five years. This contract provided for a specified annual rental to be paid to the city equal to four per cent and an annual sinking fund of one per cent upon the city's investment.

Contract No. 2 was entered into in July, 1902, by the Board of Rapid Transit Railroad Commissioners and the Rapid Transit Subway Construction Company. This provided for the construction of

a subway line from South Ferry to Atlantic avenue, Brooklyn, and the operation by the Rapid Transit Subway Construction Company for thirty-five years, without renewal, at a specified annual rental to be paid to the city calculated in the same way upon the city's investment.

Both contracts were, so far as they related to leasing and operating the lines as subways, assigned to the defendant Interborough Company, with the approval of the Board.

These contracts contained the provision that " the contractor shall during the term of the lease be entitled to charge for a single fare upon the railroad the sum of five cents but not more."

These lines were operated at considerable profit after being opened in 1904 until 1919. In 1903 the defendant leased the elevated lines of the Manhattan Railway Company for nine hundred and ninety-nine years, for a payment of seven per cent upon the stock of the Manhattan Company, and the interest on certain bonds and other minor expenses. It operated these lines, together with extensions, as its " Manhattan Division."

In 1906 (Chap. 472) the Rapid Transit Act was again amended by inserting provisions requiring the approval of the city by its board of estimate and apportionment to every step in the creation of rapid transit facilities and particularly in connection with the execution of any contract or extension certificate having to do with this subject.

After that amendment no rapid transit railway could be constructed, no contract with respect to the equipment, maintenance or operation of a rapid transit railroad could be made, except upon approval of the city through the board of estimate and apportionment.

These provisions appear to have been enacted with a view to preventing the State from forcing on local authorities any new routes or extensions of old lines, or terms upon which extension certificates should be granted.

Although rapid transit contracts were not directly to be made by the city with the transit companies, nevertheless the Board (now Commission) was prohibited from making any contracts without the approval of the city.

After 1906 the concurrence of the State and the local authorities was requisite to the making of any such contracts. The city was also permitted to operate at public expense or to lease to a private corporation, which might be constructing lines under contract with the city, but this was not an essential requirement.

In 1907 the Public Service Commissions Law was enacted and subsequently revised in 1910. (See Laws of 1907, chap. 429;

Laws of 1910, chap. 480.) In 1921 (Chap. 134) the statute was renamed as the Public Service Commission Law, and on April 25, 1930, after the trial but before the granting or entry of judgment in the above-entitled action and after the granting of certiorari order herein, the short title of the statute was changed to Public Service Law and is now so known. (See Laws of 1930, chap. 782, amdg. § 1.) The basic statute involved in this case is used in this opinion as the Public Service Commission Law. It is this statute upon which the claim is based that the defendant can abrogate its contractual rates of fares and establish increased rates without the consent of the city and without reference to the Rapid Transit Act under which these contracts were made and even against the will of the city and the Transit Commission acting in its behalf.

In the *Gilchrist* case in the United States Supreme Court, which was the injunction suit brought before the Federal statutory court here in February, 1928 (279 U. S. 203), the United States Supreme Court pointed out that the Public Service Commission Law is a general law relative to regulation and control of public utilities throughout the State. The court there declared that that law contained no words purporting to amend or modify the Rapid Transit Act except those which abolish the Board of Rapid Transit Railroad Commissioners and confer the powers and duties formerly imposed on them upon the Public Service Commission.

Section 26 of the Public Service Commission Law, which provided concerning the matter of just and reasonable charges, states that common carriers shall furnish such service and facilities as shall be safe and adequate and just and reasonable, and that all charges made or demanded by such corporation for service rendered shall be just and reasonable and not more than allowed by law or by order of the Commission having jurisdiction, and every unjust or unreasonable charge for service or transportation of passengers or property in connection therewith or in excess of that allowed by law or by order of the Commission was prohibited by such act.

Nothing is mentioned in these provisions, which are general provisions in respect to just and reasonable charges, with respect to rates fixed in contracts thereafter entered into under the Rapid Transit Act. Nowhere in the Public Service Commission Law is there anything subjecting the Rapid Transit Act to the terms of such law. There seems no basis for the contention of the defendant that the Public Service Commission Law inferentially subjected the Rapid Transit Act to its terms and provided a means for increasing the five-cent fare which was fixed by contract under a special act of the Legislature, to wit, the Rapid Transit Act.

As before stated, the United States Supreme Court pointed out that there are no words in the law purporting to amend or modify the Rapid Transit Act, except those transferring the powers of the Board of Rapid Transit Railroad Commissioners to the Public Service Commission.

Neither section 29 nor section 49 indicates that it was the intention of the Legislature to apply the provisions of those enactments to contracts entered into under the Rapid Transit Act. But there are other provisions under the Public Service Commission Law which indicate that such was not the intent.

Section 87 of the Public Service Commission Law (renum. § 127 by Laws of 1910, chap. 673) repeals sections 1 to 3, inclusive, of the Rapid Transit Act, abolishing the Board of Rapid Transit Railroad Commissioners, who had theretofore possessed the contractual authority under the Rapid Transit Act. All that contractual authority was transferred to the newly-created Public Service Commission of the First District. It gave the Commission certain powers in addition to its regulatory powers. That is, in addition thereto the Commission was to exercise all the powers theretofore conferred upon the Board of Rapid Transit Railroad Commissioners under chapter 4 of the Laws of 1891, and under section 83 of the Public Service Commission Law (renum. § 123 by Laws of 1910, chap. 673) all the powers and duties of the former Board were to be exercised by the Public Service Commission of the First District. (See, also, Laws of 1907, chap. 429, § 5, subd. 6.)

If there were an intent to set up a State agency having jurisdiction to abolish contractual rates when they were no longer reasonable and fix a rate which would render compensation adequate, there would seem to be some necessity to indicate such intent by abrogating this specific authority to contract for a fixed rate theretofore exercised under the Rapid Transit Act by the Board of Rapid Transit Railroad Commissioners.

When the Public Service Commission Law was enacted, it changed the former situation only by abolishing the Board which it had constituted as the contracting body and substituting the newly created Public Service Commission for the First District. One agent was substituted for another; the Legislature went no further. It vested the new contractual body with all the powers of the old and repealed only that portion of the Rapid Transit Act which had to do with the existence of the earlier Board. This gave the Public Service Commission regulatory authority under the general provisions of the Public Service Commission Law, and also all the contractual authority of the Board of Rapid Transit Railroad Commissioners.

In 1909 (Chap. 498) the Rapid Transit Act was again revised by extending even further the powers of the Commission and the city. The Commission, with the approval of the board of estimate and apportionment, was authorized, instead of selling the franchise at public sale, to grant a franchise to construct and operate rapid transit lines as had previously been provided by section 7. The specific limitations of this section requiring that a franchise for private construction and operation be conditioned on a five-cent fare were repealed, and section 22 of the Rapid Transit Act, as added by chapter 498 of the Laws of 1909, provided that the Commission was to have power to prescribe all such terms and conditions of such grant, and to require such security to be given for the keeping and performance of the terms of the contract as it might deem to be for the best interest of the public and of the city.

The 1909 amendments were intended to be a revision of the Rapid Transit Act so as to make it conform to the changes in its provisions as brought about through the enactment of the Public Service Commissions Law in 1907. Wherever it referred to the Board of Rapid Transit Railroad Commissioners, it was made to refer to the Public Service Commission of the First District. Several of the section numbers of the statute were changed. Sections no longer in force were repealed, but the power of the Commission to enter into contracts for the equipment, maintenance and operation of the municipally-owned lines was undisturbed, and the enactment required such contracts to contain such terms and conditions as to rates of fares to be charged and the character of service to be furnished as said Commission should deem to be in the public interest. Extension certificates for existing lines were to be made upon such terms and conditions and requirements as the Commission should deem proper.

If there were the intent to prevent the Commission from contracting for a fixed rate of fare pursuant to these powers, and it were the intent of the Legislature to nullify these powers by permitting the Commission to change by regulation the rate to be fixed under the Rapid Transit Act, it seems out of all probability that such an intent would not have been indicated under the 1909 amendments.

After the subways constructed under contracts 1 and 2 had been in operation for some time, additional lines were obviously needed and two plans for construction and operation were agreed upon. One, with the Interborough Company and the other with the Brooklyn Rapid Transit Company. The Interborough Company's agreement as proposed later became contract 3, and the elevated extension certificate of 1913.

Much of the labor of the negotiators and the defendant was devoted to making it perfectly clear that the five-cent fare proposed to be agreed upon was to endure during the term of the agreements. In these negotiations the city wished the Interborough to undertake the construction, principally at the city's expense, of a new subway line from an outlying section in Brooklyn to and along the west side of lower Manhattan connecting with the upper west side subway already in operation by the Interborough Company. It also desired another line from sections in Brooklyn not yet built up to and along the east side of upper Manhattan connecting with the lower east side subway already in operation. These lines were to be equipped by the Interborough Company and to be operated with the lines already contracted for under contracts 1 and 2, for a single five-cent fare.

The terms of the contract under contracts 1, 2 and 3 it desired to " synchronize " so that they would all expire simultaneously at the end of forty-nine years. The conferees announced their intent and desire to extend the five-cent fare zone in all directions from the center of the city. There were additional new lines which the Interborough Company was requested to operate as part of its system and there was the right to recover at the end of ten years all or part of the new lines, or part of the new and part of the old lines, so that the city might acquire a continuous line for operation in competition with the other line that the Interborough Company would retain.

When these contracts were agreed upon there was no doubt in the mind of any one of the conferees as expressed in the record of the negotiations that the five-cent fare in each contract would constitute an unchangeable rate on each system, subway and elevated, binding upon all the parties irrespective of the profits it might yield or the losses it might cause.

The city gave up to the company preferential payment in contract 3 under which the Interborough Company received before any sums accrued to the city, a payment based upon the average earnings of the company under contracts 1 and 2 for the last two years of operation. The company desired the provision for the reason of the advantage received by it, through the preferential payment, and because such contract prevented the future reduction of the fare below the five cents, regardless of the profits it might earn. For many years these profits were such that the five-cent fare might have been reduced under the Public Service Commission Law except for the apparent recognition of the binding force of the contract so far as the fare was concerned.

The so-called Wagner Bill was enacted, as the United States Supreme Court in the *Gilchrist Case (supra)* said, " so as definitely

to authorize the contracts and certificates [already] tentatively agreed upon." These amendments provided that the contracts under which the new lines were to be constructed should require them to be operated in connection with the earlier lines then under operation under contracts 1 and 2 for a single fare. These amendments when compared with the provisions of contract 3 and the certificate for extension of elevated lines, were counterparts of what had been informally agreed upon before the amendments were enacted, and incorporated after they were enacted in contract 3 and in the certificate.

The renumbered Rapid Transit Act, as amended by the Wagner Bill, gave the Public Service Commission, with the approval of the local authorities, full power to provide for the maintenance, supervision and operation of railroads to be constructed at the expense of the city and to enter into a contract with any person, firm or corporation qualified to carry it out. Every such contract so made was required to contain such terms and conditions as to rates of fare to be charged and services to be furnished as the Commission should deem best suited to the public interest.

As to the elevated certificate, section 24 of the renumbered Rapid Transit Act, as re-enacted in 1912, gave the Public Service Commission, with the approval of the board of estimate and apportionment, power to fix and determine routes by which any corporation might extend its lines, and with like approval, construct, maintain and operate such extensions and authorize any corporation to lay additional tracks for the accommodation of passengers; to provide for the compensation to be made to the city by the corporation and make such other requirements and terms as the Commission and local board should deem just and proper.

These certificates, under subdivision 4 of section 24 of the renumbered Rapid Transit Act, as amended in 1909 (Chap. 498), upon acceptance, were deemed to constitute a contract between the corporation and the city, and the Commission was given the power to enforce such contract in the name and behalf of the city according to its terms.

Subdivision 8 of section 27 of the renumbered Rapid Transit Act, as renumbered and amended by the Wagner Law, provides that in case of failure or neglect on the part of the corporation to observe and fulfill the conditions, the said city by the Public Service Commission could terminate the contract, take possession of the road, maintain and operate the road as agent for the contracting party, or contract with some other corporation for operation, and the new contract was to contain such terms and conditions as the Commission should deem necessary.

Subdivision 3 of section 29 of the renumbered Rapid Transit Act, as amended by the Wagner Law, provides that the Commission was also given the power to bring such action or actions in the name and on behalf of the city as might be necessary for the protection of the rights of the city.

The 1912 amendments contained in the statute (Wagner Law) describe the nature of the contracts so minutely, and having been drafted by the Legislature with full knowledge of the terms and conditions of contract 3 and the certificate, the inference is inescapable that the Legislature intended to sanction these very contracts and the very provisions in them which fix a five-cent fare.

Section 27 of the renumbered Rapid Transit Act, as re-enacted by the Wagner Law, relative to subway contracts, and section 24, relating to elevated extension certificates, give the broadest powers to the Commission and the city to contract concerning the rate of fare.

This history of the amendments and the litigation connected therewith are persuasive as to the intention of the Legislature to vest the power in the city and the company both as to subway and elevated lines to make binding contracts for an unchangeable five-cent fare.

There is no mention in contract 3 or suggestion that the contract was made under the Public Service Commission Law. Article 3 of the contract provides: " This contract is made pursuant to the Rapid Transit Act which is to be deemed a part hereof as if incorporated herein." The elevated extension certificates issued at the same time as contract 3 likewise contain in their recitals that they are carried out in pursuance of and made under the authority of the Rapid Transit Act, which conferred the power to contract. There is a complete absence of suggestion that the certificates were issued under the Public Service Commission Law or subject to its provisions.

The certificates were to endure for the term of eighty-five years unless sooner terminated upon notice given as provided in the certificates after the expiration of ten years from the date thereof. At the expiration of the term the additional tracks and extensions revert to the city without compensation to the company.

The certificates provide that the authorizations and licenses granted thereby are to be subject to the terms, conditions and requirements which appear to the Commission to be proper, and among these terms, conditions and requirements the one which was regarded by the parties as its most important one is the condition that the entire system be operated for a single fare of five cents, but not more.

The Interborough Company accepted these terms, conditions and requirements. The whole system of preferentials and deductions and grants to the company indicates that it was the intention of the parties that the single five-cent fare should endure regardless of the consequences during the entire life of the contract, and that the preferential payment provisions were intended to be the only protection afforded the company against any diminution of profits that might result from the operation of the extended elevated system at a single five-cent fare.

The city was to receive no part of the net earnings of the elevated lines, old or new, until those earnings should equal the previous earnings of the earlier lines, and the city's interest in such earnings was subordinated to the payment of interest and sinking fund on the $46,000,000 of bonds issued to pay for the extensions and third tracks. Then the earnings in excess of previous earnings as thus computed were to be divided between the city and the Interborough Company.

It was for these sacrifices that the city was enabled to procure the five-cent fare provision in the certificates and to procure the agreement of the defendant to this provision.

The approval of contract 3 and the certificate was required, under the expressed provision of sections 24 and 27 of the Rapid Transit Act, by the board of estimate and apportionment of the city, and this approval of contract 3 and certificate was made on the same day by a resolution of the board of estimate and apportionment, March 19, 1913.

The Legislature having provided that no contract or certificate could be executed by the Commission except with the approval of the city, it seems illogical to contend that both of these agreements, contract 3 and the acceptance of the certificate for extensions of the elevated lines, would be subject to immediate alteration in the essential provisions under the regulatory powers of the Public Service Commission without any approval on the part of the city or consent to submit such questions for determination.

The Interborough Company seems to have concluded some time in May, 1920, that an increase in the fare on the subway line might be granted under section 49 of the Public Service Commission Law, for in that month they made application for such increase, and after hearing the matter the Commission decided it had no jurisdiction and dismissed the petition of the Interborough for want of jurisdiction to determine a rate of fare different from that fixed in contract 3. Proceedings were instituted to certiorari this action of the Commission by writ for refusing such jurisdiction.

This court granted preference of that matter, but the company did not avail itself thereof, and after two years, having presented a brief with the contention now made here, the company discontinued the proceedings.

In 1921, by chapters 134 and 335 of the Laws of 1921, the Public Service Commission Law was amended in certain important respects by substituting the Transit Commission for the Public Service Commission for the First District, which had jurisdiction with respect to transit matters theretofore exercised in the First District by the Public Service Commission.

This was an enactment under which the Transit Commission then created was to undertake the preparation of a plan of readjustment of transit facilities in the city of New York for the relief of the emergency declared then to exist.

There was also in the amendments of 1921 a change in section 49 of the Public Service Commission Law.

The amendments, so far as the Transit Commission was concerned, gave three commissioners, to be appointed by the Governor, jurisdiction of transit matters within a city containing over 1,000,000 inhabitants, and the jurisdiction of the Public Service Commission was continued with respect to gas, electric light, steam, telephone and other corporations within the city. The Public Service Commission was deprived of jurisdiction over transit matters in the city, these being thus transferred to the Transit Commission.

A new article, known as article 6, was added to the Public Service Commission Law, giving additional powers and jurisdiction to the Transit Commission, and contemporaneous amendments were made regarding section 49. By this article the Legislature provided for the preparation and execution of a plan of readjustment of transit in New York to relieve an alleged emergency in transportation, either by acquiring the lines of the city by recapture or by new contracts with the company modifying the contracts previously executed. The Commission was thus to act in a contractual capacity. This article contemplated the preparation of a plan of readjustment and the execution of agreements, if such were possible, between the Commission and the transit companies affected. The questions of rates of fare to be provided for by such new contracts modifying earlier rapid transit contracts were to be considered by the Commission, but, as the statute says, only in connection with the plan or any new contracts executed pursuant thereto.

One of the purposes intended to be accomplished by the plan and the new contracts as set out in section 106, added by the amendments of 1921, is: " The assuring to the people of the city

the continued operation of the railroads at the present or lowest possible fares consistent with the just valuations of the railroads and their safe and economical operation."

Section 108 states that this may be accomplished by new contracts with the companies modifying the earlier rapid transit contracts. The section provides that the Commission might agree with the railroad companies upon changes in and modifications of the terms and conditions of the contract under or pursuant to which any railroad or any part thereof has been or is to be constructed, equipped, maintained or operated, or such contract may be canceled and replaced by a new contract to include the railroads embraced in such existing contract.

Public hearings were required to be held on the proposed contracts and they were to be submitted to the local authority (board of estimate and apportionment), and if the local authority refused to approve such new contracts the Commission might nevertheless execute and deliver them, except as specified in the statute.

It seems apparent from the text and nature of the amendments, that the Legislature regarded the fare provisions and the other provisions of the rapid transit contracts as possible of alteration only under the contractual authority vested for that purpose in the Commission by article 6. However, this contractual authority was provided to be exercised without the approval of the city only in connection with the readjustment of rapid transit facilities. These provisions, authorizing these rapid transit contracts to be modified by contract, without approval of the city, were subsequently abrogated by further legislation in 1925. (See Laws of 1925, chap. 641, adding to Pub. Serv. Comm. Law, § 112.)

Prior to the amendments of 1921 subdivision 1 of section 49 (as amd. by Laws of 1911, chap. 546) contained special reference as to the regulation of fares authorized by statute, but no reference to fare established by contract or franchise condition or other agreement.

The amendment in 1921 also carried a provision affecting section 49, so that the clause read that regulation of fares may be made notwithstanding that a higher or lower rate, fare or charge has been heretofore prescribed by general or special statute, contract, grant, franchise condition, consent or other agreement. Any such change in the rate, fare or charge to be upon such terms and conditions as the Commission might prescribe. This gave some color to the contention that the Commission was given power under this amendment under such safeguards as it might prescribe to alter a rate of fare stipulated by a " contract, grant, franchise condition, consent or other agreement." If this change was inserted in order to bring these rapid transit contracts under the jurisdiction of the

Commission, the Legislature could not, therefore, have considered them to be within the jurisdiction of the Commission theretofore — that is, prior to the amendment of 1921.

The statute now stands precisely as it did prior to the amendment of 1921.

Under this 1921 amendment of section 49, the defendant in 1922 made an application for an increased fare. This was made, as was the one in 1920, under section 49 of the Public Service Commission Law, but, unlike the earlier application, it was made with respect to the subway and the elevated lines. On the same day that the company made application under the 1921 amendment to section 49 to the Commission for an increased rate of fare, the Legislature on March 22, 1922, enacted an amendment to section 49 by chapter 153 of the Laws of 1922, so as to forbid the increase of contract rates except as part of an arrangement for readjustment of the transit lines. This it did by adding at the conclusion of the provision, a further proviso which set forth that, anything therein contained to the contrary notwithstanding, except in the case of a common carrier other than a street railroad corporation, not proposed by the Commission to be included in the plan of readjustment under the provisions of article 6, the Transit Commission was forbidden to increase or authorize the increase of any rate of fare prescribed by any such general or special statute, contract, grant, franchise, condition, consent or other agreement, except as part of a plan of readjustment. It would seem thus that the Legislature again determined that the Commission under its regulatory powers was not to be permitted to alter these rapid transit contracts, but only by acting in a contractual capacity under the amendment of 1921, which added article 6, which contemplated new contracts to modify those previously executed.

This power to grant increase having thus been removed by the amendment of 1922, the Transit Commission refused to take jurisdiction, and denied the application of the Interborough Company for lack of jurisdiction. The defendant did not review this matter either by judicial proceedings or otherwise. This contract 3 and the certificate still remained in effect.

In 1923 on message from the Governor urging that the Transit Commission and the Public Service Commission be deprived of all power to alter rates fixed by contract, the Legislature responded by chapter 891 of the Laws of 1923, again amending section 49 by striking out the words, " contract, grant, franchise condition, consent or other agreement," which had apparently induced the company to apply for an increased fare in 1922. At that time the Legislature eliminated the proviso which had been introduced in

1922, thus restoring section 49 to the form in which it stood before the amendment of 1921. Thus was eliminated all reference to rate of fares stipulated by contract, or grant, or franchise, or condition, or consent, or other agreement.

Thereafter and subsequently to an " Investigation of the Management of Affairs of the Transit Commission," in which the opinion was expressed that the rate of fare could not be increased except by agreement with the city, a circumstance which the United States Supreme Court remarked upon in its opinion, the Interborough Company memorialized the Legislature for an increased fare upon the theory that the relief could be authorized by the Legislature alone. This memorial is significant as disclosing the company's conception of the jurisdiction of the Transit Commission which has not since been changed by law. The United States Supreme Court said of this memorial (279 U. S. 208): " The purpose of the Commission " in bringing this suit to enforce the contracts (that is, this present suit now here) " was in entire accord with rulings announced as early as 1920 and seemingly no longer controverted when, in 1925, the Interborough applied for legislative relief."

The theory upon which the company asked the Legislature to increase the rate of fare was that it should exercise its police power, which was thus conceded not to have been delegated to the Transit Commission.

Instead of enacting legislation giving authority to raise these fares under the police power of the State, the Legislature in 1925 (Chap. 641) passed an act amending article 6 of the Public Service Commission Law, as added in 1921, by adding section 112, which prohibited the Transit Commission from executing or delivering any contract to effectuate any plan of readjustment therein provided for without obtaining the consent and approval of the city.

The foregoing statutory history sets forth chronologically the relevant statutes without making any attempt at completeness or to reconcile the changing section and article numbers as now existent under the present Public Service Law pursuant to recent legislation passed by various acts in 1930.

It would seem then that the Legislature not only deprived the Commission of the power to revise the contracts in any particular under its regulatory power, but also deprived it of the power to regulate or increase the rate of fare in connection with any plan of readjustment provided for by the act of 1921, without the consent of the city, whose approval to the execution of such contracts was in the first instance required by the Rapid Transit Act.

How could it then be said that notwithstanding this dissolving

of power, even in connection with the plan of readjustment, it was intended that the company might have the rates of fare altered under the contract, against the opposition of the city?

After its public announcement in its memorial that it was the purpose of the company to carry out the contracts with the city without further request for change, the Interborough Company voluntarily filed its schedules at a five-cent rate of fare to become effective on September 15, 1925.

The defendant then instituted proceedings on February 1, 1928, under section 29 of the Public Service Commission Law, to secure an increased fare by filing amendatory schedules to be effective on March 3, 1928, thus purporting to cancel the schedules of 1925 then in effect.

It announced that it had established a fare of seven cents per passenger, and thereafter the defendant made the unsuccessful attempt to increase the fare by litigation in the Federal courts, but the Transit Commission and the city procured injunctions restraining the Interborough Company from making any change or alteration in its rate of fare, pending the hearing of a suit to perpetually enjoin the violation of its contract and to require specific performance.

Subsequent to the suit in the Federal court begun on February 14, 1928, the Transit Commission rejected the seven-cent fare schedules, which the company had filed under section 29, and the Commission denied an application which the company had made simultaneously asking the Commission to exercise its discretionary power to put the new rate into effect before the expiration of the thirty-day period, under section 29.

The Commission decided that it had no jurisdiction or power to regulate rates of fare fixed in contracts entered into pursuant to sections 24 or 27 of the Rapid Transit Act and held that the method of increasing rates of fare which is provided for in section 29 of the Public Service Commission Law is in any event not applicable to rates fixed by contract. This ruling of the Commission would appear to have been approved in the *Dry Dock R. R. Co.* case, holding that section 29 is not a method for changing a fixed rate of fare established by statute and is only useful in attempts to change the rates of fare by filing schedules where the original rate for fare or service has been fixed in schedules theretofore filed and approved. It is not, however, insisted by the Transit Commission that this is a point upon which the decision should rest, although the city, by the corporation counsel appearing as *amicus curiæ*, did raise the contention that the procedure under section 29 was illegal and had been overruled under the *Dry Dock R. R. Co.* case.

Thereafter, on June 19, 1929, the defendant filed a complaint and petition with the Transit Commission seeking an inquiry, under section 49 of the Public Service Commission Law, into the reasonableness of the five-cent rate of fare on the elevated lines or Manhattan division of the company.

This complaint and petition was dismissed, after a hearing, on the ground that it was improperly brought during the pendency of the suits and special proceedings in this court and in violation of the restraining orders issued therein.

There is no doubt that this was a correct disposition of the matter and certiorari proceedings to review the decision of the Commission with respect to the elevated lines alone should be dismissed, as all the questions raised have been submitted for decision by the defenses in the suit brought by the city against the Interborough Company and have reference to the power of the company to charge any increased rate of fare on either the subways or elevated divisions. This controversy was decided in this proceeding and the certiorari proceeding is purely academic.

We think, therefore, that the Commission has no jurisdiction over these rates; that the Legislature has not given it any of its sovereign power to regulate the rates; and that since all doubt should be resolved against the jurisdiction of regulatory tribunals and no such jurisdiction clearly appears, but on the contrary a determination of the Legislature to prohibit such regulation, it would seem to follow from the history of the legislation with respect to this Transit Commission's power, that no such power is to be taken by implication and only language which admits of no other reasonable construction could be deemed to confer it. We find a lack of power over these rates which prohibits the Transit Commission from exercising any jurisdiction thereof.

The Rapid Transit Act, re-enacted subsequent to the enactment of the Public Service Commission Law of 1907 (Wagner Law of 1912), authorized the parties to enter into contract 3 and the elevated extension certificate, and to agree therein upon a rate of fare to be in effect during the terms of the contract.

The United States Supreme Court has pointed out that where public service corporations and governmental agencies dealing with them have the power to contract as to rates and exert that power by fixing, by contract, rates to govern during a particular time, the enforcement of such rates is controlled by the obligation resulting from the contract, and, therefore, the question of whether such rates are confiscatory becomes immaterial.

If the Commission had power to contract as to rates of fares on the subway and elevated lines, there can be no doubt that the

Transit Commission has no regulatory power to revise the terms of a contract so authorized. Its very purpose was to establish arrangements that would not be susceptible of change except as a result of further agreement between the parties. While this is agreed to be true, by the defendant, as to contracts before enactment of the Public Service Commission Law of 1907, it is contended not to be true as to contract 3 and the certificate made thereafter. The defendant insists that the rates fixed in all contracts, including those entered into under the Rapid Transit Act, were required to be adequate to yield a reasonable return and were, therefore, subject to revision under sections 29 and 49 of the Public Service Commission Law, having to do with the regulation of rates.

If a reasonable rate of fare does not always coincide with a contractual rate as determined by the parties, a contract made by legislative authority must be the supreme test, because if it is not the supreme test, the authority to contract for a fixed rate of fare becomes meaningless. The contention of appellant amounts to the argument that there can be no difference between rates fixed in the contract entered into pursuant to the Rapid Transit Act and rates charged by public utilities where there is no contract at all. If no contract exists concerning rates of fare, the rate by operation of law is required to be reasonable, and the argument here is that precisely the same consequences flow where a contract exists with respect to fare made under legislative sanction.

The fare provision of a contract is absolutely useless if it means no more than that the contract rate will only be enforcible if it is of such a nature and produces such a revenue that it would be imposed in any event by the Public Service Commission Law. The statute should not be construed to authorize that to be done which could be done without its enactment.

Whenever the general terms of the Public Service Commission Law have covered a subject dealt with by particular legislation, it has been held that the Commission was without jurisdiction and that the application of the particular legislation was exclusive.

This is in accord with the settled rule that particular legislation is not modified or repealed by a general statute, although the terms of the latter would, but for the particular law, include the case provided for by it. Applying these rules, it is clear that the Public Service Commission Law was not intended to apply to the subject-matter of the Rapid Transit Act.

The judgment should be affirmed, with costs, in the first mentioned action.

The order of certiorari should be dismissed and the proceedings

confirmed in the proceeding entitled in the second caption above, with fifty dollars costs and disbursements to the respondents.

FINCH, P. J., MARTIN, O'MALLEY and SHERMAN, JJ., concur.

In City of New York v. Interborough Rapid Transit Company: Judgment affirmed, with costs.

In certiorari proceeding: Order of certiorari dismissed and determination confirmed, with fifty dollars costs and disbursements to the respondents.