**CONTINENTAL BUS SYSTEM, INC.,** d/b/a Continental Rocky Mountain Lines, Inc., Petitioner,

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 7198.

United States Court of Appeals Tenth Circuit.

Dec. 5, 1963.

Edward H. Sherman, Denver, Colo. (Alfred Crager, Dallas, Tex., on the brief), for petitioner.

Herman Levy, Atty., NLRB (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, NLRB, and James C. Paras, Atty., NLRB, on the brief), for respondent.

Before PHILLIPS, PICKETT and BREITENSTEIN, Circuit Judges.

PHILLIPS, Circuit Judge.

The Continental Bus System, Inc.,[1] by petition seeks to review an order of the National Labor Relations Board, entered in a proceeding on a complaint filed against Continental, on a finding it had violated § 8(a) (1) (unilateral changing of wage rates and hours) and § 8(a) (5) (refusal to bargain) of the National Labor Relations Act as amended, 29 U.S.C. § 158(a) (1), (5). The Board by cross-petition seeks enforcement of such order.

The question presented is whether the employees involved were employees of Continental or of Sterling Bittle, Jr., who was maintaining and operating a bus terminal and depot at Grand Junction, Colorado, for Continental, an interstate carrier by bus, under a contract entered into between him and Continental. More specifically, the question is whether the relationship between Bittle and Continental was that of independent contractor and contractee or employee and employer.

The contract referred to above was entered into January 4, 1961, and was in full force and effect at all times herein material. It was designated as "Standard Commission Agency Contract." In it Bittle is designated as the Agent and Continental as the Company. The provisions of the contract here material are these: The Agent agreed to sell such tickets as the Company might supply for

---

1. Hereinafter called Continental or the Company.

it and its affiliated and connecting carriers at lawfully published tariff rates and furnish to the public information contained in tariffs, bulletins, circulars and literature applicable to the transportation of passengers or handling of baggage, express, or United States mail by the Company and its affiliated and connecting carriers; to use for the transaction of the Agent's and the Company's business and the accommodation of its patrons, a depot waiting room, wash rooms, and toilets, together with space and facilities for the sale of tickets and the handling of mail, baggage and express; to maintain such waiting room and facilities, together with all driveways, walks, approaches and appurtenant premises in a clean, sanitary and safe condition at all times; to hold the Company harmless from all claims incurred or arising directly or indirectly from or on account of any neglect or failure to so maintain such waiting room, facilities and appurtenant premises; and to properly protect the baggage, express and mail, assume full liability for the loss or damage thereof while under the Agent's care and supervision and reimburse the Company for payments or expenses incurred by it by reason of any such loss or damage;

To be liable for the protection at all times of any money or property of the Company in the care or under the supervision of the Agent and to reimburse the Company for any loss thereof or damage thereto;

To render reports of Company business daily and to remit to the Company or deposit to its account all moneys belonging to the Company or collected for the account of the Company;

To permit authorized representatives of the Company during reasonable hours to inspect and check all property of the Company and to inspect and audit all records and accounts pertaining to the Company's business, kept or supervised by the Agent, and to permit such representatives, at their discretion, to collect all moneys belonging to the Company in the possession of the Agent;

To properly file and maintain all tariffs, time schedules, folders, circulars and bulletins furnished by the Company and to furnish to the public information in accordance therewith;

To observe and handle routine dispatching of the Company's operators and busses in accordance with general instructions issued by the Company's operating officials; to relay to the Company employees special emergency instructions; to dispatch orders and information; to check and verify operators' reports; and to check and verify miscellaneous invoices, reports, and receipts of goods and materials;

To check and handle 'passenger baggage, to handle and bill express shipments, including C.O.D.'s, and to handle United States mail and the transfer of baggage, express and mail from and to coaches of the Company and its affiliated and connecting carriers.

The contract provided that the title to all tickets and proceeds thereof should at all times be in the Company and that the Company might deduct from any money due the Agent, the compensation previously allowed the Agent on tickets or transportation charges, subsequently refunded to patrons.

The contract further provided that the Company would pay the Agent designated percentages of moneys collected by the Agent or received by the Company from the sale of tickets, for express charges, from sales of charters and tours, and for excess baggage and C.O.D. fees, and to permit the Agent to deduct the commission to which he was entitled under such provisions immediately from Company funds in his possession, when making remittances to the Company, as provided for in the contract.

Continental agreed to provide for the Agent's use in the conduct of the Agent's business and the transaction of the Company's and its affiliated carriers' business, for the transfer of passengers, baggage and express and for the accommodation and comfort of the Company's patrons, depot facilities, including waiting room,

toilet facilities and facilities for the sale of tickets and the handling of baggage and express, and other facilities, such as driveways and appurtenant premises; to furnish for the Agent's use in the conduct of the Agent's business in the facilities referred to above utilities necessary for the comfort and convenience of the Agent's and the Company's patrons, including all heat, water, and electricity; and to furnish for the conduct of the Agent's business :and the transaction of the Company's and its affiliated and connecting carriers' business necessary office equipment, office supplies, forms, waybills, tickets, baggage checks and janitorial supplies necessary for maintaining the depot in clean, sanitary and safe condition, together with towels, tissue, soap and other restroom supplies, and to furnish telephone service for the handling of the Agent's and the Company's business and to pay all telephone charges incurred in the conduct of the Company's business.

That part of the contract setting forth the mutual agreements of the parties in part provided:

"2. The Company reserves no control over the Agent or any of his employees, subordinates or associates as to how the facilities involved in this contract should be furnished or the services here involved should be performed. Agent is responsible only for accomplishing the results hereby undertaken by him. The manner, method and persons used by him in accomplishing such results are for determination by Agent. Agent shall limit his activities to the consummation of the results herein specified and Agent shall have no power to bind the Company by contract or otherwise except as herein provided as to the sale of transportation of persons and/or property. The Company reserves no control whatsoever over the employment, discharge, compensation of or services rendered by an employee, subordinate or associate of Agent. The Company shall not be responsi-

ble for the acts or omissions of said employees, subordinates or associates and Agent agrees to save Company harmless from any and all liability caused by any such act or omission. It is the intention of the Company and of the Agent, in accomplishing the results undertaken by him hereunder, [sic] be an independent contractor and this agreement shall be construed in the light of such intention."

The contract further provided that its term should be from the date thereof to the termination of the sixth calendar month thereafter and for successive periods of six months each thereafter until termination at the close of any six-month period by 30 days' previous notice from either party. It further provided that default in the accounts or remittances of the Agent should be cause for the Company to immediately terminate the contract without notice and that any other violation of any of the provisions of the agreement not remedied within 10 days after notice thereof to the Agent from the Company should also be sufficient cause for the termination of the contract.

The contractual arrangement between Bittle and Continental was not an unusual one. Continental had 104 Commission Agents operating under like contracts out of its total of 107 agencies.

Prior to January 4, 1961, Continental had operated its terminal, depot, and other facilities at Grand Junction through its own employees.

In November, 1960, Amalgamated Association of Street, Electric Railway and Motor Coach Employees of America, Local No. 1468, AFL-CIO, informed Continental that the Local represented a majority of Continental's employees at the Grand Junction terminal. Continental informed the Union it would require certification by the Board. A representation proceeding followed on January 23, 1961. At such proceeding Continental contended that the employees working at the terminal were not its employees, but em-

ployees of Bittle, and that the status of such employees had changed on the coming into effect of the January 4, 1961, contract from that of employees of Continental to that of employees of Bittle.

At the representation hearing it was decided that Bittle was not an independent contractor and that the employees were employees of Continental. The record in the representation case was incorporated in the subsequent unfair labor proceeding, but the trial examiner in the latter proceeding refused to make a new determination with respect to the employer-employee relationship between Continental and the persons working at the Grand Junction terminal.

In National Labor Relations Board v. Hearst Publications, Inc., 322 U.S. 111, 125, 64 S.Ct. 851, 88 L.Ed. 1170, it was held that common law standards, such as those applied in determining whether a person was an "independent contractor," were not appropriate for determining who is an employee within the meaning of § 2(3) of the National Labor Relations Act, 29 U.S.C. § 152(3). Apparently, Congress did not approve of such a broad construction of the term "employee" (see Legislative History of the Labor Management Act, 1947, pp. 309, 536, 537 and 1537) and for that reason by the Act of June 23, 1947, 29 U.S.C. § 152(3), narrowed the definition of the term by an amendment providing "the term 'employee' * * * shall not include * * any individual having the status of an independent contractor * * *."

■ While due regard must be had for the purposes of the Act,[2] nevertheless the so-called "right to control test" derived from the common law has been generally applied by the courts and by the Board since the 1947 amendment.

■ The relation of master and servant exists where the employer has the right to direct and control the method and manner in which the work shall be done and the result accomplished; and an independent contractor is one who engages to perform services for another, according to his own methods and manner, free from the direction and control of the employer in all matters relating to the performance of the work, and accountable to him only for the result to be accomplished. The line of separation between the two is the degree of direction and control. In the former, direction and control cover both method and manner of doing the work and the result produced. In the latter, direction and control are limited to the result and do not apply to the method and manner of the rendition of the service.[3]

However, other matters, such as the permanency of the relation, the investment in facilities for the performance of the work, and opportunity for profit or for loss may be considered.[4]

■ Paragraph 2 of that portion of the contract which sets forth the mutual agreements of the parties, quoted above, clearly reserved to Bittle the right to control and direct the method and manner of doing the work, free from all direction from Continental, except as to the results to be accomplished; and under such provision Bittle was free to hire as his own employees the persons to perform the work, to enter into agreements with them respecting their wages, hours and working conditions, to discharge them, to direct them in performing the work, and to select his subordinates and associates and prescribe their duties; and he was to be responsible for any acts or omissions of such employees, subordinates and associates. We find

2.  Minnesota Milk Company v. N. L. R. B., 8 Cir., 314 F.2d 761, 765.

3.  Jones v. Goodson, 10 Cir., 121 F.2d 176, 179; United Insurance Company of America v. N. L. R. B., 7 Cir., 304 F. 2d 86, 89; Albert Lea Cooperative Creamery Assn., 119 N.L.R.B. 817, 821, 822; Miller v. Sinclair Refining Compa-

ny, 5 Cir., 268 F.2d 114, 117, 118; Beatty v. Halpin, 8 Cir., 267 F.2d 561, 564; Conasauga River Lumber Company v. Wade, 6 Cir., 221 F.2d 312, 315, c.d. 350 U.S. 949, 76 S.Ct. 324, 100 L.Ed. 827.

4.  United States v. Silk, 331 U.S. 704, 716, 67 S.Ct. 1463, 91 L.Ed. 1757.

nothing in the other provisions of the contract inconsistent with the provisions of Paragraph 2.

By such other provisions Bittle agreed to take over, maintain and operate the bus depot and terminal facilities and the appurtenant premises, in order to provide services and accommodations to Continental's passengers, shippers and patrons. His principal functions were to maintain and operate the waiting room and facilities for such passengers, shippers and patrons, to sell tickets and other transportation, to handle baggage, express and mail, and to give information to such passengers, shippers and patrons. To accomplish those ends and purposes, he hired ticket agents, ticket clerks, baggage men, janitors, and others to carry out the work under his direction.

The provisions of the contract with respect to direction and control set forth in such Paragraph 2 were not merely colorful. Both Continental and Bittle at all times carried out the contract in full conformity with the spirit and intent manifested by the language thereof.

Under the undisputed evidence, Bittle at all times performed the services required of him under the contract, according to his own manner and method, free from the direction of Continental, except as to the results to be obtained. He, alone, negotiated and entered into separate contracts with the persons he hired as his employees, subordinates, or associates. He made his own terms and conditions of work. His employees, subordinates, and associates were subject to his sole control and supervision; and he hired and discharged his employees, negotiated new salary schedules with the workers, made his own records, had his own payroll, filled out his own Social Security reports, withheld taxes for income tax purposes, set up his own records, paid his workers, and had made plans to take out employee insurance.

While he took over the former employees of Continental, he made changes in shifts, in rates of pay, and in the duties of the employees; he made changes in the baggage room; and he exercised freedom to solicit and advertise for business on his own. With respect to such actions, he was not required to, nor did he obtain any approval or consent from Continental. At no time did Continental in anywise assert a power or right to control the manner or means of Bittle's performance, to supervise or interfere with his employees, or to tell him how to operate the terminal facilities.

The contract was not the result of the representation hearing. It had been under consideration from March, 1960. Its purpose was to improve services and to effect economies. The change was due to economic necessity, not as a result of any hostility to unions.

Bittle's remuneration was to be derived from profits and was not to be in the form of wages. Realization of profits depended on his business skill, managerial ability and judgment, and his individual initiative. He was free to determine the number of persons he would hire, the hours he would work, and the extent to which he would solicit charter, tour, and other business through advertising or personal solicitation. He was free to exercise his independent operational judgment in those vital areas which would determine whether he would realize a profit.

Upon entering into the contract, Bittle moved his family and his home from Durango to Grand Junction, sold his house at Durango, and relinquished nine years of seniority arising out of his previous jobs and the benefits which had accrued to him by reason of his former employment, thereby plainly indicating he contemplated the contract would remain in effect for a long period and would be permanent in character.

Counsel for the Board rely heavily on the decision of this court in King v. Southwestern Greyhound Lines, 10 Cir., 169 F.2d 497. While the contract in that case contained many provisions like the contract in the instant case, there are important differences in the two contracts. One, in the King case the contract was on a monthly basis and terminable at will by either party on giving

10 days' notice, or immediately by Greyhound for violations of the contract or default by King; and two, King was to perform all of his work and services under the contract "in a *manner* satisfactory to" (italics ours) Greyhound; moreover, the King case involved the question of the existence of an employer-employee relationship within the meaning of § 8(e) of the Selective Training and Service Act of 1940, 54 Stat. 890, not the existence thereof under § 2(3), supra, and involved the claim of King that he was entitled to be restored to his place under the contract on his return from military service. King was obligated to perform his duties under the contract, not merely satisfactorily, with respect to the results to be accomplished, but *"in a manner satisfactory to"* (italics ours) Greyhound. That fact, coupled with the fact the contract was on a monthly basis and could be terminated without cause at any time by Greyhound on 10 days' notice, gave Greyhound, in effect, full control over the manner and means to be used by King in performing his work and services under the contract. And it was those provisions with respect to the manner of doing the work to the satisfaction of Greyhound and the provisions with respect to termination, peculiar to the King case and absent here, which this court emphasized in its decision that Greyhound could completely control the method and manner in which King was to perform his work and services.

If Bittle was an independent contractor, he was authorized, acting in his own behalf and not as the representative of Continental, to hire and by agreement fix the wages, hours and other working conditions of the persons employed by him to carry out the work and to discharge them. If he was Continental's

employee, he would be obligated to pay the wages, conform to the working conditions and seniority rules, and otherwise perform the provisions of the collective bargaining agreement entered into by Continental and such persons, although he would have no authoritative voice in the making of such bargaining agreement.

If the language of the contract is susceptible of more than one interpretation, the court should construe the contract in the light of the situation and relation of the parties at the time it was made, and, if possible, accord it a reasonable and sensible meaning, consonant with its dominant purpose.[5]

Where consistent with its language, that construction of the instrument will be preferred that will result in a contract the parties probably and normally would enter into, rather than one which is improbable and unusual.[6]

It is altogether improbable that the parties intended that Continental should enter into a collective bargaining agreement with the employees at the terminal as its employees, fixing their wages, hours and other working conditions, and that Bittle should then be obligated to pay such wages and otherwise perform such collective bargaining agreement, in the making of which he would have no authoritative voice.

We conclude that Bittle was an independent contractor and not an employee of Continental, and that the persons employed by Bittle at the terminal were his employees and not the employees of Continental.

The case is remanded, with instructions to the Board to vacate its order and enforcement of such order is accordingly denied.

5. Miller v. Robertson, 266 U.S. 243, 251, 45 S.Ct. 73, 69 L.Ed. 265; Miller v. Miller, 10 Cir., 134 F.2d 583, 588, c.d. 320 U.S. 744, 64 S.Ct. 46, 88 L.Ed. 441; Parlantos v. Garoufalis, 10 Cir., 89 F.2d 203, 205; International Co. of St. Louis v. Sloan, 10 Cir., 114 F.2d 326, 329, c.d. 311 U.S. 702, 61 S.Ct. 142, 85 L. Ed. 455; Operator's Oil Co. v. Barbre, 10 Cir., 65 F.2d 857, 860.

6. Liberty Nat. B. & T. Co. v. Bank of America Nat. T. & S. Ass'n., 10 Cir., 218 F.2d 831, 840; Phillips Petroleum Co. v. Gable, 10 Cir., 128 F.2d 943, 944; Kenyon v. Automatic Instrument Co., 6 Cir., 160 F.2d 878, 888.