CONCERT RADIO, INC., Respondent, v GAF CORPORATION et al., Appellants.

First Department, May 9, 1985

## APPEARANCES OF COUNSEL

*Arthur L. Liman* of counsel (*Max Gitter* and *Steven Gey* with him on the brief; *Paul, Weiss, Rifkind, Wharton & Garrison,* attorneys), for appellants.

*Harry E. Youtt* for respondent.

*Barbara A. Lee* of counsel, for Listeners' Guild, Inc., *amicus curiae.*

## OPINION OF THE COURT

Asch, J.

WNCN-FM broadcasts classical music 24 hours a day. In 1974, the then owner of WNCN, Starr Broadcasting Group, Inc. (Starr), finding it not profitable to operate the station under a classical music format, transformed the station to a rock music station under the call letters of WQIV. This resulted in a storm of opposition from WNCN listeners. Several public interest groups were formed to oppose the change. They included the Listeners' Guild, Inc., and Classical Radio for Connecticut, Inc. (Listeners and CRC, respectively, and Listeners Groups, collectively).

When Starr's license came up for renewal before the Federal Communication Commission (FCC) in 1975, the Listeners Groups filed petitions to deny the application for renewal, and organized Concert Radio, Inc. (Concert), to challenge Starr's license to operate WNCN. Concert filed a competing application for the license, pursuant to FCC rules, stating its intent to operate WNCN as a classical station.

While Concert was pursuing its challenge to Starr's license with the support of the Listeners Groups, GAF approached Starr and expressed an interest in acquiring WNCN. Starr agreed, in principle to sell the station to GAF for approximately $2.2 million. GAF intended to restore the classical music format as well as the call letters WNCN. In order to transfer the license to GAF, FCC approval of the transfer had to be obtained and Concert's competing application for the license had to be overcome. After extensive negotiations and consultation with the FCC, a so-called "five-party agreement" was entered into among Starr, GAF, Concert and the Listeners Groups, on February 19, 1976, which made it possible for GAF to acquire WNCN. One condition of the five-party agreement was GAF's entry into an option agreement with Concert, dated April 9, 1976.

The option agreement recites that: "[I]t is GAF's intention to operate Station for at least five years primarily as a classical music station * * * and it is GAF's present intention to sell

Station if it no longer wishes to operate it primarily as a classical music station within the next five years, and it is therefore willing to give Concert the option provided for herein".

The option provides in paragraph 1: "1. GAF hereby gives Concert, for a period of five (5) years from the closing date under said WQIV Sales Agreement, an option to acquire the Station Assets for the purpose of operating Station primarily as a classical music station, subject to the exercise of programming discretion as a licensee consistent with the public interest, if GAF decides to sell Station, or transfer control of Station to someone other than a subsidiary or affiliate of GAF, it being understood that any merger or consolidation involving GAF with or into any other corporation shall not be treated as a sale of Station or a transfer of its control within the meaning of this option agreement." The option price is spelled out in detail, but in essence it is somewhat more than GAF"s book cost for the radio station (the $2.2 million plus GAF"s additional capital expenditures less depreciation thereon). GAF is required to notify Concert promptly of the decision to sell, and if Concert gives notice of a bona fide intention to exercise the option, GAF must provide certain information and tender a form of agreement. There is *no* requirement that Concert be notified of the identity of the proposed buyer or the price or terms of the proposed sale. The option agreement also provides Concert with a right of first refusal, if Concert does not exercise the option, as follows: "If thereafter during the remainder of the five (5) year period provided for in Paragraph 1 GAF receives and is prepared to accept a bona fide offer to buy Station, Concert shall be given written notice of such offer and the terms and conditions thereof and may, within sixty (60) days of such notice, exercise its right of first refusal by making a firm and binding commitment to purchase Station at a price which is the lesser of the offered price or Two Million Five Hundred Thousand Dollars".

On December 29, 1980, the GAF board of directors adopted a resolution which contains a preliminary finding that it would be advantageous, "to offer for sale certain of the operations of the Corporation or, in the event sale on acceptable terms is not feasible, to discontinue such operations."

The resolution then directed the officers to: "take such actions as may be necessary or appropriate to *effect the sale* of the corporation's operations in the following areas * * * radio station WNCN (owned and operated by GAF Broadcasting Company, Inc.) and * * * in the event that such officers determine that sale of any such operation or operations on acceptable terms is not

feasible, to effect the discontinuance of such operation or operations" (emphasis added).

On December 30, 1980, a press release was issued and a press conference announcing these actions was held, at which GAF's chairman and chief executive officer claimed that GAF had saved WNCN, but admitted that it was not profitable, and concluded that "this is the time to pass the baton". The necessary bookkeeping entries were made and the Securities and Exchange Commission (S.E.C.) was also duly notified regarding the aforementioned resolution.

Without waiting for a notification from GAF that it had decided to sell the station, as required by the option agreement, Concert gave GAF the appropriate notice of intention to exercise its option, on January 12, 1981. On January 23, 1981, GAF replied to such notice, denying that it had decided to sell the station to "someone" and contending that the option would not be exercisable until it had done so. GAF also refused to supply a form of agreement or financial information as required by the option agreement.

Concert sued in February 1981, seeking specific performance of the option agreement and compensatory damages. At a bench trial in June 1984, GAF contended that a decision to offer for sale was not a decision to sell, which could only be made to a known purchaser at a specified price and upon certain terms and conditions. The trial court held that there could be a decision to sell without an identifiable purchaser at a specific price, and directed specific performance by GAF of the contract entered into with plaintiff, dated April 9, 1976, subject to any limitations on the court's jurisdiction.

The central question is whether Concert's right to exercise its option was, in fact, triggered by GAF's conduct in announcing and planning for the sale of WNCN in 1980. It is GAF's contention that a decision to sell could not be made until it approved an identified buyer and a specific selling price.

In interpreting the language of the option agreement, "[t]he intent of the parties must be distilled from the terms of the written agreement itself" (*Frankel v Tremont Norman Motors Corp.*, 21 Misc 2d 20, 22, *affd* 10 AD2d 680, *affd* 8 NY2d 901).

While GAF contends that the language requires that a specific "someone" be named before a decision to sell could be made, the plain reading of the clause reveals that the drafters envision two separate events. The option may be triggered if "GAF decides to sell Station" and the option may also be triggered if GAF decides to "transfer control of Station to someone other

than a subsidiary or affiliate." The word "someone" modifies the words "transfer control" rather than "sell".

Trial Term's conclusion that the plain meaning of the option clause does not require a known buyer to trigger the option is also manifested in the recital clause to the option agreement (*supra*). This language clearly manifests the intent that GAF would be willing to sell to Concert at the point where it no longer wished to operate a classical music station. Thus, an actual new buyer would not be necessary, only a desire to no longer operate the station primarily as a classical music station.

In addition, it is significant that there are two different methods by which Concert could purchase WNCN. The first is the option and the second is the right of first refusal. However, GAF's interpretation of the word option in paragraph 1 as requiring an identified purchaser and an existing offer, actually renders the option equivalent to the right of first refusal, which is separately set out (*supra*). As a rule of construction requires the adoption of an interpretation that will operate to give a rational meaning to all clauses in a contract (*Laba v Carey,* 29 NY2d 302, 308), the full effect given to all clauses of the option agreement requires a conclusion that the actions by GAF had triggered the option.

The December 29, 1980 board resolution determined that it would be "advantageous * * * to offer for sale" certain of GAF's operations and that officers were directed to "take such actions as may be necessary or appropriate to effect the sale of the Corporation's operations in the following areas * * * radio station WNCN * * * or [if that is not feasible] to effect the discontinuance of such operation or operations." The resolution also directed the proper officers to execute and deliver the necessary instruments to sell WNCN. Public statements followed and GAF's 1980 financial statements and S.E.C. forms 8-K and 10-K filed in 1981 listed WNCN as a discontinued entity under GAF's restructuring plan. Thus, a review of all the actions taken by GAF show that this was not a decision to offer WNCN for sale so as to test the market to determine the station's value but was, in actuality, as manifested by GAF's conduct, an unequivocal decision to sell the station.

GAF's reliance upon *Holland v Hannan* (456 A2d 807 [DC App 1983]) is misplaced. Although the *Holland* court concluded that listing with brokers was only the contemplation of a sale and that there would be no unequivocal decision to sell until the tenants decided to accept a firm offer from an identified buyer, the court observed that "express statements, agreements, or

other conduct * * * short of a firm contract with a third party, may also amount to an 'unequivocal' manifestation of a determination to sell" (*supra,* at p 810).

In the case herein, it is not the specification of a certain price which determined whether GAF had "decided to sell". The conduct of GAF manifested a determination to sell, as shown in the resolution of the board of directors, the redeployment plan, the listing of WNCN as a discontinued business, the public statements and the representations by GAF to its shareholders and the S.E.C. The trial court was thus correct in determining that the option agreement had been triggered by the actions of GAF.

However, the direction of specific performance, under the circumstances present herein, by Trial Term, was inappropriate. It has long been settled that specific performance will not be granted where it would cause unreasonable hardship or injustice to the party, even if it was the one who breached the contract (Restatement [Second] of Contracts § 364). In determining whether such hardship exists, the courts look not only to the detriment that would be suffered by defendant, but also to the value of the performance to the plaintiff. If the hardship to the defendant is disproportionate to the value of the performance sought by plaintiff, specific performance will be denied (11 Williston, Contracts § 1425, at 832-833 [3d ed 1968]).

Here, plaintiff Concert took no risks, invested no money and suffered no losses as a result of the option contract. The entire purpose of the contract, which was to maintain WNCN as a classical music station for five years, has been fulfilled. "Plaintiff has not changed his position in any substantial sense as a result of [defendant's action], nor has he suffered any damages of consequence. If [specific performance is denied,] the plaintiff will lose nothing but an uncontemplated opportunity to gather in a windfall" (*Gordon v Mazur,* 284 App Div 289, 293, *affd* 308 NY 861).

Under the judgment appealed from, plaintiff is entitled to purchase WNCN for approximately $2.9 million. Defendant will lose $1.8 million in cumulative operating losses incurred by the station plus the lost interest on GAF's $2.9 million purchase price and capital investment. In addition, GAF would lose the substantial increase in value created by its improvements and efforts, and future profits.

Wrongs are not redressed by repeated wrongs. This is especially true, where, as here, the "wrong" complained of is a technical triggering of the option agreement by defendant's

mistake or misunderstanding regarding the interpretation of the contract language. As a practical matter, if GAF thought the option applied, it need only have waited five months, when the option would have expired. "While such a mistake might not avail the defendants in an action for damages at law, it will not foreclose inquiry by a court of equity into the justice of bestowing a windfall on one party because the other party misconstrued the technical provisions of their contract. Before decreeing specific performance in such a case, the court will measure relative hardships and prejudices as well as nice legal rights" (*Gordon v Mazur, supra,* at p 292).

Trial Term cited the majority holding in *Graf v Hope Bldg. Corp.* (254 NY 1) to support its conclusion that no penalty or forfeiture was involved in granting specific performance. However, the subsequent case law has adopted the reasoning of Chief Judge Cardozo's dissent in that case (*see, J.N.A. Realty Corp. v Cross Bay Chelsea,* 42 NY2d 392, 399; *Karas v Wasserman,* 91 AD2d 812).

Although specific performance is not justified on the facts herein, there was a showing that defendant breached the option agreement. Plaintiff would, therefore, be entitled to the difference between the market value of the radio station at the time of the breach and the price set by the option agreement. Plaintiff sought compensatory damages in the second cause of action in its complaint and there was some testimony, during the trial, as to the market value of WNCN at the time of the breach. However, since the main focus of the parties and the court was directed at the first cause of action seeking specific performance, we remand to Trial Term for a determination of damages upon the breach.

Accordingly, the judgment of the Supreme Court, New York County (Myers, J.), entered October 15, 1984, which, after bench trial, ordered specific performance of the option agreement dated April 9, 1976, by defendants, should be modified, on the law and facts, and in the exercise of discretion, to vacate the direction for specific performance, grant judgment for plaintiff as to liability upon the second cause of action of the complaint, remand for an inquest as to damages, and otherwise affirmed, without costs.

KASSAL, J. (dissenting in part). I dissent in part and would affirm for the reasons stated in the opinion of Justice Allen Murray Myers.

This appeal raises the issue of when may a party, otherwise entitled to specific performance, be denied such relief on a claim

of "hardship" or "windfall" as a result of a significant increase in the value of the asset?

The majority has concluded that specific performance will result in unreasonable hardship or injustice and, therefore, is an inappropriate remedy. By implication, it holds there would be a penalty or forfeiture if this equitable relief is granted. In my view, the contrary is the case — there is no resulting hardship in directing the parties to perform exactly in accordance with the terms of their express agreement. Considering all the circumstances of the case and the relative positions of the parties, I believe a damage award will be inequitable and a most inadequate remedy here.

It is undisputed on this record that Concert Radio, Inc., has a long commitment to preserving a classical music format for the operation of WNCN as an FM radio station in the New York City metropolitan area. This was the central purpose underlying its formation and its vigorous opposition before the Federal Communication Commission in 1975, when that agency was considering a license renewal application by Starr Broadcasting Group, Inc., the then owner of WNCN. It was at that time that GAF Corp. acquired the station after persuading listeners' groups that it would maintain WNCN as a classical station. The parties then entered into the option agreement at issue here, which provided that GAF intended to operate the station for a period of "at least five years primarily as a classical music station" and granted Concert Radio a five-year option to acquire the station should GAF decide to sell it or transfer control to someone other than a subsidiary or affiliate.

On December 29, 1980, by a formal resolution of GAF's board of directors, a business decision was made to sell or discontinue eight unprofitable GAF operations, one of which was WNCN. This was well publicized by a press release, issued December 30, 1980, the very next day, confirming that, as a matter of business judgment, GAF had determined, as part of "a major restructuring plan", to rid itself of the station because it was unprofitable. The press release reported that GAF had bought the station in 1975, "when prior owners switched from classical to rock music. 'It was a cultural asset that had to be saved and improved * * * We believe this is the time to pass the baton to some other enterprise that will cherish this independent, tax-paying, non-subsidized cultural institution.' "

Under the circumstances, I fail to perceive the basis for the majority's conclusion that the decision to sell, which clearly triggered the exercise of the option by Concert Radio under their agreement, was merely a mistake or constituted a "hardship".

While it is true that if GAF had waited five additional months, the option would have expired, it did not do so. In my view, the record does not support the conclusion that GAF "misconstrued the technical provisions of their contract," as found by the majority. Rather, GAF, a multinational conglomerate, with assets in the hundreds of millions of dollars, knew exactly what it was doing. It proceeded according to a calculated plan of divestiture. It is incomprehensible that such a critical business decision was made and publicized without extensive consultation with its counsel and financial advisors and after a thorough discussion by its board of directors. As noted, from the press release, this was not a casual off-handed statement but one involving 8 or 9 different operations. It was but one segment in an intricate business decision reached in conjunction with "a major restructuring plan to improve its [GAF's] return on investment and reduce debt."

While the majority alludes to the fact that Concert Radio had assumed no risk and invested no money in connection with the option, the view overlooks the significant facts that the option was issued for fair and substantial consideration in connection with the transfer to GAF of the application for the license to operate the station. Furthermore, GAF made a deliberate business judgment to sell the station's assets or discontinue its operation. Although the central thrust of the majority's conclusion is that specific performance will result in an unjustified windfall to the plaintiff, in my judgment, the conclusion reached by my colleagues in essence grants an unwarranted windfall to the multimillion dollar conglomerate, at the point where GAF had elected to rid itself of what it then considered to be an unprofitable or possibly even a valueless enterprise. Viewed in that context, the wrong to be redressed is the plaintiff's right to proceed in accordance with the terms of the clearly agreed upon option, which the majority concedes was properly exercised.

Essentially, the majority has concluded that it may relieve GAF from performance under the explicit terms of the option on a finding that, by reason of subsequent events, the agreement has proved to be unprofitable or too costly. To the contrary, it has been repeatedly held that the fact that a contract subsequently proves to be unprofitable or onerous does not furnish an adequate excuse or justification for nonperformance (*Cameron-Hawn Realty Co. v City of Albany,* 207 NY 377, 381-382; *City of New York v Interborough Rapid Tr. Co.,* 136 Misc 569, 578, *affd* 232 App Div 233, *affd* 257 NY 20; *Schmidt v C.P. Bldrs.,* 36 AD2d 731; *Lowe v Feldman,* 11 Misc 2d 8, 17, *affd* 6 AD2d 684;

*Rosenfeld Realty Co. v Cadence Indus. Corp.,* 75 Misc 2d 634, 637; *see also,* 55 NY Jur, Specific Performance, § 7, p 439). In the absence of extraordinary circumstances which are not present here, the enforceability of a contract is to be judged at the time it was entered into and, if fair when made, subsequent events which render the agreement substantially more onerous or costly than originally anticipated do not preclude specific performance as an available remedy.

In terms of Concert Radio's desire to maintain a classical format, damages will afford it no real remedy. Plaintiff's interest is in ensuring future classical programming in the operation of the station and not the receipt of sums representing the difference in the market value at the time the option was exercised. Trial Term concluded that "Concert's primary motive in exercising its option is to be assured that the classical music lovers will continue to be served" and "WNCN has a peculiar and special value to Concert." The conclusion that the station "is a unique establishment which could not be duplicated on the open market" impels a finding that money damages are inadequate and specific performance most appropriate.

*Gordon v Mazur* (284 App Div 289, *affd* 308 NY 861), relied upon by the majority to illustrate the concept of "hardship", is clearly distinguishable. GAF, the multifaceted conglomerate, is hardly in the same position as Mrs. Mazur, who transferred her interest in certain real property to her attorneys, as trustees for her infant son, overlooking the fact that some years before, she had entered into an agreement with plaintiff (who owned the property with her as tenants in common) that neither would sell, transfer or assign his or her interest without first offering it to the other at cost. Under those circumstances, we permitted equity to intervene to correct the mistake by directing the trustees to reconvey the interest in the property, thus restoring Mrs. Mazur to her former status as a co-owner, a result which, it was found, would avoid "an uncontemplated opportunity to gather in a windfall" (284 App Div, at p 293). Contrary to the suggestion by the majority, no "hardship" results where the party seeking specific performance realizes the benefit of a very good bargain by subsequent events. Were we to deny the remedy of specific performance here, GAF would obtain a real windfall by paying damages and retaining a greatly enhanced asset, all in violation of their unambiguous agreement.

Unlike the majority, I do not sympathize with the plight of GAF — this savvy and well-counseled world-wide business operation, which, as a result of the exercise of the option, was

compelled, pursuant to their agreement, to transfer to the plaintiff what GAF had already decided to sell or terminate without compensation if a sale proved not to be viable. To conclude that the decision of the board of directors of GAF in this regard was merely a "mistake or misunderstanding regarding the interpretation of the contract language," is pure sophistry, speculation and ignores business reality. Specific performance, under the facts of this case, is a most meaningful and critical remedy and gives full effect to the clear and unmistakable terms of the option agreement between the parties.

SANDLER, J. P., and BLOOM, J., concur with ASCH, J.; KASSAL, J., dissents in part, in an opinion.

Judgment, Supreme Court, New York County, entered on October 15, 1984, modified, on the law and the facts, and in the exercise of discretion, to vacate the direction for specific performance, grant judgment for plaintiff as to liability upon the second cause of action of the complaint, remand for an inquest as to damages, and otherwise affirmed, without costs and without disbursements.