**Donald CARNER, Plaintiff,**

v.

**GRIST MILL '76 CORP., Defendant.**

Civ. A. No. 85–0207–S.

United States District Court,
D. Rhode Island.

May 29, 1986.

Blish & Cavanagh, Joseph V. Cavanagh, Jr., Edwards & Angell, Higgins, Cavanagh & Cooney, Joseph V. Cavanagh, Sr., Providence, R.I., for plaintiff.

Tillinghast, Collins & Graham, Paul Sanford, Douglas A. Giron, Providence, R.I., for defendant.

## MEMORANDUM OF DECISION

SELYA, District Judge.

This case was tried to the court on April 30, 1986, May 5, 1986, and May 6, 1986. The parties requested an opportunity to submit posttrial briefs (now received). This rescript constitutes the court's findings of fact and conclusions of law. Fed.R. Civ.P. 52(a).

### I.

The plaintiff, Donald Carner, a citizen of Florida, was the president and sole shareholder of Carner Realty Co., Inc. (CRC). By written assignment dated May 10, 1983 (Ex. 10), CRC assigned its rights relevant to the matters here at issue to Carner, who has become the real party in interest. Fed. R.Civ.P. 17(a). (CRC has been dissolved.) The defendant, Grist Mill '76 Corp. (Grist) is a Rhode Island corporation with its principal place of business located in this state. Jurisdiction is premised on 28 U.S.C. § 1332(a).

On September 21, 1964, CRC entered into a lease (Lease) with Rathbone Realty Company referable to some 48 acres of unimproved land in Seekonk, Massachusetts. The gravamen of the Lease (Ex. 1) was the development and construction of an eighteen hole golf course (now known as the Firefly Golf Course) upon the demised premises, and the ensuing operation thereof. CRC built the golf course and operated it without incident (or discernible profit, for that matter) from 1965 to 1980. Grist became the owner of fee title to the land by

deed and an assignment of Lease granted by Rathbone's bank, as Rathbone's successor in interest, on December 13, 1974 (Ex. 2). Grist took title subject to the Lease and, in effect, became CRC's landlord.

In early February, 1980, Carner and David Friedman, an officer and principal of Grist, attended a hastily convened meeting. Dan Brown, who had been managing the golf course for Carner, had been terminated, and Carner was not interested in abandoning his Florida domicile to take an active role in the operation of the Firefly. Friedman, on the other hand, had been seeking an option to buy out CRC's lease; Grist had hopes of developing the property for commercial purposes. And, some earlier development efforts (e.g., tennis courts and a racquetball facility) had led to (justifiable) complaints by the lessee. There was a "fit." Friedman, acting for the defendant, agreed to buy out the Lease (which had roughly 20 more years to run, plus a 15–year renewal option) and purchase the existing personal property at the golf course. A price of $200,000 was negotiated between the parties for surrender, including the personal property. After the oral "handshake" agreement had been reached, Grist's lawyers prepared the documentation. As of February 29, 1980, CRC and Grist executed an "Agreement-Surrender of Possession and Termination of Lease" (Termination Agreement) for surrender of the former's leasehold interest and for the sale of certain personal property. Under the Termination Agreement (Ex. 3), $19,288.57 was due and payable upon surrender, and the remaining balance after closing adjustments ($180,000) was to be paid according to the terms of a promissory note (Note) dated March 1, 1980. (This Note has since been assigned to the plaintiff. *See ante.*) As noted earlier, Grist allocated $73,300 of the price to the personalty. Under the Note (Ex. 4), Grist agreed to pay 108 equal consecutive monthly installments, each installment in the amount of $1,666.67. The initial installment was due and payable on March 1, 1981. No interest was to be paid unless a default occurred, in which case the maturi-

ty date would be accelerated and the entire remaining balance would become immediately due and payable with interest at the "legal rate." The Termination Agreement and the Note were both drawn by the defendant's attorneys.

Prior to executing the Termination Agreement, Grist's agents examined the personalty which it was purchasing from CRC, and inventoried it. No later than this time, Grist learned that a storage shed on the premises had been destroyed by fire in late 1979. CRC had collected approximately $10,000 in insurance proceeds as a result of the blaze. (Although the defendant denies it, the court finds that, because of the location of the shed and its easy visibility, agents of Grist were aware of this damage before February 1980.) Friedman did not mention either the extent of the equipment or the condition of the course during his negotiations with Carner, and, prior to the execution of the Termination Agreement, Grist did not raise any questions about or discuss with CRC the completeness of the inventory, the operability of the equipment, the condition of the golf course, or the state of repair of the buildings and improvements.

In June 1980, Grist notified CRC for the first time of the plaintiff's supposed breaches of the Lease and of the Termination Agreement. *See* Ex. I. The defendant reserved the right to offset its alleged damages against the indebtedness arising out of the Termination Agreement. *Id.* In October 1981, Grist filed a complaint in the state court (Ex. 11) with respect to the ostensible breaches, but that suit came to naught. In the meantime, Grist began to make monthly payments on the Note, but with excruciating slowness. CRC was obliged to send default notices on many occasions from March 1981 through November 1982 due to the defendant's failure to pay monthly installments when due (that is, on the first of each month).

The fruits of the defendant's habitual procrastination became considerably more bitter when it missed the November 1982 due date. Grist was notified by letter dat-

ed November 4, 1982 (Ex. 5) that it was in default under the Note because it had not paid the November 1, 1982 installment, and that unless the default was cured within 15 days, all amounts due would be accelerated. This billet-doux galvanized the defendant into immediate (but ineffectual) action. On November 5, 1982, Grist (unknowingly) sent an unsigned check (Ex. 5A), which was received by CRC on or about November 9, 1982. (This draft, like all installment payments made in respect to the Note, was sent "under protest.") The plaintiff did not instantaneously boggle or yelp. Rather, CRC craftily bided its time. On November 30, 1982, after the grace period had expired, CRC notified Grist by letter that, inasmuch as Grist had not cured the default by November 20, 1982 as required by the Note, it was now in default, that the entire balance due on the Note ($146,666.60) was now due and payable, and that interest would begin to accrue instanter.

It is uncontradicted that, throughout this laying-in-wait period, there was sufficient funds in defendant's checking account to cover the amount of the November check had it been presented for payment; that, although CRC and its attorney were aware upon receipt of the check that it was unsigned, they never attempted seasonably to notify Grist; and that, once the defendant's bevue surfaced, it promptly tendered a certified check covering the November installment. The court finds that, had defendant been notified of the unsigned check within the grace period, Grist would have promptly rectified the situation. The court likewise finds that the check delivered to CRC on November 9, 1982 was unsigned purely as a result of an inadvertent clerical or bookkeeping error.

Grist continued to make monthly payments pursuant to the Note (under protest, as aforesaid) up to and including the December 1984 installment. Thereafter, Grist made no further payments. By letter dated February 13, 1985 (Ex. 9), CRC again notified Grist of its default under the Note, but to no avail.

It is undisputed that, if the Note was accelerated as a result of the November 1982 snafu, the principal balance then due on the Note was $146,666.60; if, on the other hand, default occurred no earlier than February, 1985 (following the expiration of 15 days after Grist received written notice of default in respect to the January 1985 installment), the principal balance due on the Note at that time was $103,333.18.

In the roiled wake of these events, this litigation ensued. Carner sought to recover on the Note, and Grist counterclaimed for breaches of the Lease and Termination Agreement and damages consequent thereto.

## II.

Grist has not denied that monies are owed under the Note. Its chief contention is that substantial sums should be offset against this indebtedness. That argument raises, in the first instance, questions of document construction.

The Termination Agreement contained the following language:

> [T]he parties hereto have agreed and do hereby agree that the Lease, together with all options and rights thereunder, shall be and is hereby terminated and cancelled and the term thereof is brought to an end as of March 1, 1980, with the same force and effect as if the term of the Lease were, by the terms hereof, fixed to expire on March 1, 1980 and not on the date of expiration set forth under the Lease.

Two provisions of the Lease must also be noted. Article 4 of the Lease limned a "covenant to repair" which provided in pertinent part that:

> ... Lessee shall keep and maintain the exterior and interior of all buildings and improvements on the demised premises in good and substantial repair and conditions (sic).

> In the event of partial or complete destruction of any building or improvement during the final five (5) years of this Lease, Lessee shall rebuild, replace or

repair same in such a manner that such rebuilding or replacement shall result in substantially the same building or improvement.

Article 14 of the Lease contained a "covenant to surrender" which provided that:

At the expiration or sooner termination of this Lease, lessee shall peacefully yield up and surrender the demised premises and all buildings and improvements thereon in good order and condition and repair as required by the provisions of this lease, reasonable wear and tear excepted.

The defendant contends that there is an inherent ambiguity in the above-quoted language from the Termination Agreement. The cancellation of "the Lease, together with all options and rights thereunder" is at seeming variance with the stipulation that the term of the Lease will be prematurely brought to an end "with the same force and effect [as at] ... the date of expiration." The court concurs that these statements are seemingly at odds. Indeed, that is why parol evidence was permitted at the trial.

■ The amphiboly in the paperwork does not, however, benefit the defendant in any meaningful way: the covenants to repair and to leave in good condition do not survive. Under the precepts which pertain, the documents should be construed against the party which prepared them. *Ferber Co. v. Ondrick,* 310 F.2d 462, 465 (1st Cir.1962), *cert. denied,* 373 U.S. 911, 83 S.Ct. 1300, 10 L.Ed.2d 412 (1963). Moreover, if the disputed phraseology of the Termination Agreement is taken in the full context of the contemporaneous documentation as a whole, the plaintiff's interpretation—that the parties intended to wash out by means of the Termination Agreement all rights and obligations inter sese except those specifically reserved therein—appears far more reasonable. If, as Grist exhorts, the Lease was to be treated as at normal expiration, there would have been no reason to provide particularly for the proration of rent and real estate taxes (as was done in the Termination Agreement). As the Supreme Court has taught:

The intention of the parties is to be gathered, not from the single sentence above quoted, but from the whole instrument read in the light of the circumstances existing at the time of negotiations leading up to its execution.

*Miller v. Robertson,* 266 U.S. 243, 251, 45 S.Ct. 73, 76, 69 L.Ed.2d 265 (1924).

What gets the grease from the goose in this case is the testimonial evidence at the trial, viewed in the light of the circumstances which were extant at the time when the bargain was struck. It is hornbook law that:

If the language of the contract is susceptible of more than one interpretation, the court should construe the contract in the light of the situation and relation of the parties at the time it was made, and, if possible, accord it a reasonable and sensible meaning, consonant with its dominant purpose.

*Continental Bus System, Inc. v. N.L.R.B.,* 325 F.2d 267, 273 (10th Cir.1963).

Both Carner and Friedman acknowledged that their single negotiating session was conducted on short notice and that it was brief and to the point. There was little to discuss except for price: Carner wanted to rid himself of an albatross (the responsibility for operating the Firefly) and Friedman wanted to clear Grist's land of a long-term encumbrance. Once the price had been settled, Carner gave Friedman the keys then and there. At no time did they discuss the condition of the golf course. At no time did Friedman ask to inspect the golf course, or its buildings, or the personalty. He never inquired about the costs associated with the operation of the Firefly. It is plain that Friedman was not interested in the course *qua* course; he was interested in using the land, free of an encumbrance which had a potential for lasting 35 years into the future, for real estate development. His primary object was to obtain a surrender of the Lease. He was content to take the structures and the per-

sonal property "as is." That is what Grist received—nothing more.

Without belaboring the point, virtually all of the indicators in the record point in this direction. Grist knew of the destruction of the storage shed, but did not raise the question at the February 1980 meeting. Grist inventoried the personal property before the Termination Agreement was executed and did not demur. The bill of sale for the personalty (Ex. 12) did not contain repair covenants. Grist earmarked only $73,300 out of the purchase price for chattels; that allocation included lighting fixtures (which Carner had told Friedman were worth close to $60,000), so the defendant obviously expected to obtain comparatively little else by way of equippage. Friedman was, by his own admission, not "familiar" with the details of the lease provisions when he cut the deal with Carner. The litany could go on—but to no useful purpose. The only plausible interpretation of the situation is that Carner would walk away free and clear of any past, present or future obligations;[1] Grist would recapture the premises and take over whatever personalty then existed (in whatever condition it might prove to be) and the improvements, in whatever state of (dis)repair.[2] And, this interpretation dovetails exactly with the most logical reading of the (poorly-drawn) documents.

The court holds that, by the Termination Agreement, Grist cancelled and annulled all of its rights against CRC for any alleged failure to maintain and repair the Firefly Golf Course and the buildings and improvements thereon; that the obligations contained in Articles 4 and 14 of the Lease, respectively, were of no further force upon the signing of the Termination Agreement; that Grist received all of the personal property for which it had bargained; that CRC had no residual duty to augment or to refurbish any equipment; and that the "options and right" under the Lease upon which Grist relies in this litigation were, without exception, extinguished by the execution and delivery of the Termination Agreement. Such extinguishment, by the intention of the parties and by the wording of the instruments, obliterated both previously accrued liabilities and obligations to be performed in the future. Grist, therefore, cannot prevail on its counterclaims, nor is it entitled to any set-off on the primary complaint. The plaintiff has proven each and every element of his case as to liability. All that remains is for the court to determine damages.[3]

## III.

### A. *Default.*

The check for the November 1982 installment payment was unsigned. Therefore, it constituted a non-negotiable instrument. Be that as it may, it would be draconian on the facts of this case to deem an inadvertence of this sort as constituting a default of the Note entitling Carner to receive a trouvaille of accrued interest. This is espe-

---

1. CRC did warrant that it had not sublet the Firefly or otherwise alienated its rights under the Lease. It also warranted that it was "the lawful owner of the ... goods and chattels" conveyed; that the same were "free from all encumbrances;" and that CRC had "good right to sell the same." *See* Ex. 12. The presence of these limited express warranties (all of which were true) further buttresses the conclusion that there were no warranties at all with respect to the condition of the structures or the personalty, or with respect to the sufficiency of the grounds and equipment to enable a golf course operation to be conducted.

2. The parties intended, too, that any claims which Grist might have to insurance proceeds vis-a-vis the unrepaired shed would likewise be extinguished. Grist knew of the fire, and must therefore have had some awareness of the possibility of an insurance claim. In any event, Kenneth Adler, Friedman's myrmidon, knew of the carrier's payment by March, 1980 and no meaningful demand for restoration of these funds was ever made. (In this suit, the defendant, as counterclaimant, has pressed no cause of action for conversion of the settlement proceeds.)

3. Grist's contention that the language of the bill of sale somehow reflected an entitlement to additional personal property is puerile. The defendant was to receive what personalty then existed, "where is" and "as is"—nothing more. This is precisely what the plaintiff conveyed and delivered.

cially so because of the plaintiff's knowledge that the check was unsigned, his deliberate decision to lurk in ambush and to await the expiration of the grace period, and his failure to notify Grist of the error at a point when notification would have enabled the debtor to cure. The law ought not to reward a party for laying traps stealthily in the night. In *100 Eighth Avenue Corp. v. Morgenstern*, 150 N.Y.S.2d 471, 3 Misc.2d 410, 417–18, appeal at 164 N.Y.S.2d 812, 4 A.D.2d 754 (1957),[4] a New York court, confronted with an analogous "oversight" issue, held that a defendant's unintentional failure to sign a check intended as payment of a promissory note did not justify acceleration of the entire mortgage indebtedness on the ground that to hold otherwise would be inequitable and unconscionable. 150 N.Y.S.2d at 478–79.

■ The authorities upon which Carner relies are of scant consolation to him. *Graf v. Hope Building Corp.*, 254 N.Y. 1, 171 N.E. 884 (1930), was a 4–to–3 decision of the New York Court of Appeals, in which the dissent (authored by Justice Cardozo) is considerably more persuasive than the majority opinion. Indeed, the later New York cases appear to view *Graf* in the same perspective. *See, e.g., Concert Radio, Inc. v. GAF Corp.*, 488 N.Y.S.2d 696, 108 A.D.2d 273 (1985); *Fairmont Associates v. Fairmont Estates*, 472 N.Y.S.2d 208, 99 A.D.2d 895 (1984); *Karas v. Wasserman*, 458 N.Y.S.2d 280, 91 A.D.2d 812 (1982); *Morgenstern, supra. See also In re Kron Chocolatier, Inc.*, 53 B.R. 811, 813 (Bankr.S.D.N.Y.1985); *In re Nicfur-Cruz Realty Corp.*, 50 B.R. 162, 168 n. 6 (Bankr. S.D.N.Y.1985); *State v. Amoco Production Co.*, 645 P.2d 468, 471 n. 1 (Okla.1982). *Cf. Bisno v. Sax*, 175 Cal.App.2d 714, 346 P.2d 814, 821–22 (1959). The plaintiff seeks to take unfair advantage of the defendant's miscue. Such a tactic cannot be allowed to succeed where, as here, the holder of the Note has been guilty of sharp practice. Any other result would be uncon-

scionable. The court holds that the plaintiff's purported declaration of a default in December 1982 was ineffective. And, inasmuch as payments were made according to the tenor of the Note through December of 1984, Grist did not default until it missed the January 1985 payment and the grace period had lapsed following CRC's notice of that omitted payment.

**B.** *Amount.*

■ The parties agree that, if the February 1985 date of default controls, *see ante*, the principal balance unpaid on the Note is $103,333.18. They also agree that interest should be added thereto, by the terms of the Note, at the "legal rate." But, they dispute which interest rate is the "legal rate" called for by the Note.

Both Carner and Grist have argued this question in light of Rhode Island's statutory legal rate of interest. *See* Plaintiff's Posttrial Memorandum at 5; Defendant's Posttrial Memorandum at 12 n. 1. Thus, there is no choice-of-law riddle; inasmuch as all "parties have briefed [the] state law questions in terms of Rhode Island's jurisprudence, ... the court may accept the implicit concession that Rhode Island's substantive law governs in the premises." *Oman International Finance Ltd. v. Hoiyong Gems Corporation*, 616 F.Supp. 351, 358 n. 5 (D.R.I.1985).

So viewed, the inquiry need not long arrest the court. R.I.Gen.Laws § 6–26–1 controls. When the Note was executed, that statute fixed the rate of interest "in all business transactions where interest is secured or paid" at 6% per annum, "unless a different rate is expressly stipulated." Shortly afterwards, § 6–26–1 was amended to increase the statutory rate to 12%. *See* P.L. 1981, ch. 54, § 2. Grist urges that the original (less munificent) rate be applied; Carner advocates the updated (more generous) rate.

The plaintiff's view prevails. First, it is plain that the Rhode Island General Assem-

---

**4.** On appeal, the decision was affirmed on the point here at issue, although the decree was    modified on other grounds.

bly intended the amendment to apply to inchoate obligations previously executed, that is, to have retrospective effect. After all, the revision of § 6–26–1 was part and parcel of the amendment of the state's prejudgment interest statute, R.I.Gen. Laws § 9–21–10, as amended by P.L. 1981, ch. 54, § 1, which was specifically mandated by the legislature "to take effect upon passage (May 8, 1981), and apply retroactively to all cases pending on that date." Compiler's Note fol. § 9–21–10. *See* P.L. 1981, ch. 54, § 3. Secondly, the holding of the state supreme court in *Foster v. Quigley*, 94 R.I. 217, 179 A.2d 494, 495–96 (1962), provides a persuasive analogy in favor of using the rate which was current when the debtor threw in the towel. There are sound policy reasons why interest which begins to run only upon a future default should, absent an agreement by the parties to the contrary, be computed in accordance with the legal rate in effect when the default occurs.

Overshadowing both of these considerations, however, is the discernible intention of the parties. They presumably knew in early 1981 what the "legal rate" then was; if they had meant that rate to apply, it would have been a simple matter to quantify the interest rate as being 6%. Their use, instead, of a cryptic reference to the "legal rate" can logically be construed only as a mutual manifestation that the rate should float; if a default ensued, whatever legal rate was then on the books would govern. And, this analysis is compelling given the lengthy payout period of the Note and the rampant inflation which was running amok at the time.

In this instance, all roads lead to Rome. For these reasons, the court finds and holds that Grist is indebted to Carner for interest at 12% per annum on the outstanding principal balance, *see ante*, from the February, 1985 date of default forward.

## IV.

The plaintiff has kept and performed all of his obligations (including those of his predecessor in interest, CRC) under the Termination Agreement, the Lease, and the other pertinent instruments. Meanwhile, the defendant has defaulted in making the payments due under the Note according to the tenor thereof. Accordingly, the defendant's counterclaims must be, and hereby are, denied and dismissed with prejudice. And, judgment must enter in favor of the plaintiff on the primary complaint.

Counsel for the parties shall meet and shall jointly compute the amount of the interest accruing by reason of the default from February 1985 through June 9, 1986 (which interest, when so computed, shall be added to the principal owed, $103,333.18, to aggregate the amount of the judgment to be entered). Counsel for the plaintiff shall thereupon prepare a form of order for judgment and shall present the same to the court for entry on June 9, 1986 at 8:30 a.m. (If the parties are unable to agree upon the calculation of the amount of the interest and/or the judgment, the court will hear arguments at that time.)